NATIONAL WILDLIFE FEDERATION, Sierra Club, Idaho Rivers United, American Rivers, Pacific Coast Federation of Fisherman's Associations, Institute for Fisheries Resources, Washington Wildlife Federation, and Idaho Wildlife Federation, Plaintiffs,

Nez Perce Tribe of Idaho, Intervenor–Plaintiff,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Defendant,

Potlatch Corporation, Northwest Pulp and Paper Association, Inland Ports and Navigation Group, and Columbia River Alliance, Intervenor–Defendants.

No. Civ 99–442–FR.

United States District Court, D. Oregon.

Feb. 16, 2001.

Craig N. Johnston, Stephanie M. Parent, Portland, Oregon, Todd D. True, Kristen L. Boyles, Seattle, WA, for plaintiffs.

David J. Cummings, Nez Perce Tribal Executive Committee, Office of Legal Counsel, Lapwai, ID, for intervenor-plaintiff Nez Perce Tribe of Idaho.

Kristine Olson, United States Attorney, Thomas C. Lee, Assistant United States Attorney, Portland, OR, Fred R. Disheroon, Special Litigation Counsel, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Federal defendant.

Richard S. Gleason, Stoel Rives LLP, Portland, OR, Beth S. Ginsberg, Stoel Rives LLP, Seattle, WA, Kevin J. Beaton, Stoel Rives LLP, Boise, ID, for intervenor-defendants Potlatch Corporation and Northwest Pulp and Paper Association.

Paul M. Murphy, James L. Buchal, Murphy & Buchal LLP, Portland, OR, for intervenor-defendant Columbia River Alliance.

Guy C. Stephenson, Schwabe Williamson & Wyatt, P.C., Portland, OR, Walter H. Evans, III, Schwabe Williamson & Wyatt, P.C., Vancouver, WA, for intervenor-defendant Inland Ports and Navigation Group (Port of Lewiston, ID, Port of Whitman County, Washington, Port of Morrow, OR, and Shaver Transportation Company, et al.).

## OPINION

FRYE, District Judge.

The matters before the court are:

1. Plaintiffs' second motion for summary judgment (# 150);

2. Intervenor–Plaintiff Nez Perce Tribe of Idaho's second motion for summary judgment (# 144);

3. Defendant United States Army Corps of Engineers' second motion for summary judgment or a stay (# 162); and

4. Intervenor–Defendants Potlatch and Northwest Pulp and Paper Association's

second motion for summary judgment (# 170).

## BACKGROUND

On March 31, 1999, the plaintiffs, National Wildlife Federation, Sierra Club, Idaho Rivers United, American Rivers, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, Washington Wildlife Federation, and Idaho Wildlife Federation, filed this complaint against the defendant, United States Army Corps of Engineers (hereinafter referred to as "the Corps"). The plaintiffs allege that the actions of the Corps violate the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and its implementing regulations, and the Administrative Procedures Act, 5 U.S.C. §§ 551 *et seq.* Specifically, the plaintiffs allege that the Corps owns and operates four dams on the lower Snake River in a manner that causes or contributes to violations of the water quality standards of the State of Washington for temperature and dissolved gas, as well as the antidegradation standard.

The plaintiffs further allege that the Corps issued a Record of Decision in March of 1995 and a Record of Decision in June of 1998 which document how the Corps will operate the twelve dams on the Snake and Columbia Rivers—including the four dams relevant to this case on the lower Snake River in the State of Washington. The plaintiffs allege that the 1995 Record of Decision and the 1998 Record of Decision constitute final agency actions which violate the Clean Water Act because each final action fails to ensure compliance with the water quality standards. Complaint for Declaratory and Injunctive Relief, p. 19, ¶ 51–52.

The plaintiffs seek 1) a judicial declaration that the actions of the Corps violate the Clean Water Act; 2) an order requiring the Corps to comply with the water quality standards of the State of Washington; and 3) an order requiring the Corps to devise a schedule for achieving compli-

ance with these water quality standards as expeditiously as possible. *Id.* at p. 20.

On August 26, 1999, the court allowed the motions to intervene as defendants filed by Potlatch and Northwest Pulp and Paper Association, Inland Ports and Navigation Group, and Columbia River Alliance.

On September 1, 1999, the court allowed the motion of the Nez Perce Tribe of Idaho to intervene as a plaintiff.

On March 21, 2000, this court denied the cross-motions for summary judgment filed by all of the parties. The court concluded that it had jurisdiction to review the claims of the plaintiffs that the Corps is violating the Clean Water Act by not complying with the water quality standards of the State of Washington. The court stated, in part:

The plaintiffs allege that the 1995 Record of Decision and the 1998 Record of Decision by the Corps violate the Clean Water Act because these final agency actions fail to assure that the dams will operate in compliance with state water quality standards. The United States Court of Appeals for the Ninth Circuit has stated that "[u]nder the Clean Water Act, all federal agencies must comply with state water quality standards." *Idaho Sporting Congress,* 137 F.3d at 1153. The plaintiffs are entitled to challenge alleged violations of the state water quality standards pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701–706. *Oregon Natural Resources Council,* 834 F.2d at 850–52.

The Administrative Procedures Act provides, in part, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. This court must determine whether the actions of the Corps were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In determining whether the Corps' decisions in the 1995 Record of Decision and the 1998 Record of Decision regarding the operation of the dams were arbitrary and capricious, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. The court must consider all of the relevant factors and all of the relevant laws in deciding whether the administrative record shows that the Corps has met its obligations under the Clean Water Act in the 1995 Record of Decision and the 1998 Record of Decision.

The court concludes that summary judgment on the merits cannot be decided without reference to and reliance upon the administrative record supporting the 1995 Record of Decision and the 1998 Record of Decision. The court will allow a period of ninety days for the parties to review the administrative record and submit all relevant references to the court. The court will allow the parties to file motions for summary judgment thereafter.

Opinion of March 21, 2000, pp. 21–22.

All parties have once again moved the court for summary judgment in their favor. Each party has submitted relevant portions of the administrative record in support of its motion for summary judgment.

### FACTS AND LAW

*The Clean Water Act*

In 1972, Congress passed the Clean Water Act in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through the reduction and eventual elimination of the discharge of pollutants into those waters. 33 U.S.C. § 1251(a). The Clean Water Act provides for two primary sets of water quality measures: 1) effluent limitations; and 2) water quality standards. *See Arkansas v. Oklahoma*, 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).

"Water quality standards" are, in general, promulgated by the states and establish the desired condition of the waterway. Section 1313. The Environmental Protection Agency (EPA) provides states with substantial guidance in the drafting of water quality standards, and the states must submit the standards to the EPA for review and approval. Sections 1313(c)(2) and 1313(d)(4)(B). Water quality standards under the Clean Water Act generally consist of three elements: 1) one or more designated "uses" of that waterway; 2) water quality "criteria" specifying the amount of various pollutants that may be present in those waters and still protect the designated uses, expressed in numerical concentration limits or narrative form; and 3) a provision restricting the degradation of certain waters. Sections 1313(c)(2) and 1313(d)(4)(B).

Pursuant to the provisions of the Clean Water Act, the State of Washington has promulgated the following water quality standards:

1. Water Temperature—The State of Washington has designated the lower Snake River, throughout its course within the State of Washington, as Class A (excellent) waters. WAC 173–201A–130 (98). The general criteria for Class A waters are defined, in part, as follows:

(a) General characteristic. Water quality of this class shall meet or exceed the requirements for all or substantially all uses.

(b) Characteristic uses. Characteristic uses shall include, but not be limited to, the following:

.    .    .    .    .

(iii) Fish and shellfish:

Salmonid migration, rearing, spawning, and harvesting.

Other fish migration, rearing, spawning, and harvesting.

WAC 173–201A–030(2)(a) & (b).

The State of Washington has established a specific temperature standard for the Snake River which mandates that the water temperature shall not exceed twenty degrees Celsius due to human activities. WAC 173–201A–130(98)(a) & (b). In addition, "[w]hen natural conditions exceed 20.0Č, no temperature increase will be allowed which will raise the receiving water temperature by greater than 0.3Č; nor shall such temperature increases, at any time, exceed $t = 34/(T + 9)$." WAC 173–201A–130(98)(a).

2. Dissolved Gas—The State of Washington has established a water quality criterion for dissolved gas of "110 percent of saturation at any point of sample collection" for Class A waters. WAC 173–201A–030(2)(c)(iii). The State of Washington has granted the National Marine Fisheries Service a specific, temporary waiver of this standard in order to aid in fish passage. The National Marine Fisheries Service 1995 Biological Opinion set maximum levels of dissolved nitrogen at 12 hour averages of 115% (or an instantaneous level of 120%) at dam forebays, the area of water immediately behind the dam, and 129% of saturation (or instantaneous level of 125%) at dam tailraces, the area of water immediately below the dam.

3. Antidegradation Policy—The antidegradation policy of the State of Washington requires that "[e]xisting beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses shall be allowed." WAC 173–201A–070(1).

*The 1995 and 1998 Records of Decision*

The Corps owns and operates the four lower Snake River hydropower projects as part of the Federal Columbia River Power System. From the confluence of the Columbia and Snake Rivers looking upstream, the four lower Snake River dams are Ice Harbor, completed in 1961; Lower Monumental, completed in 1969; Little Goose, completed in 1970; and Lower Granite, completed in 1975.

The general plan of the Corps for operation of the Federal Columbia River Power System, including the four lower Snake River dams, is set forth in the Record of Decision dated March 10, 1995 (1995 Record of Decision) and the Record of Consultation and Summary of Decision dated June 24, 1998 (1998 Record of Decision). The principal issue before the Corps when it prepared the 1995 Record of Decision and the 1998 Record of Decision was how to operate the Federal Columbia River Power System to avoid jeopardizing salmon species protected by the Endangered Species Act. The option selected by the Corps was the "Reasonable and Prudent Alternative" recommended by the National Marine Fisheries Service and the United States Fish and Wildlife Service in their respective 1995 Biological Opinions. The option selected by the Corps has several essential features relating to Total Dissolved Gas compliance including a voluntary spill program and an agreement by the Corps to operate the dams at "minimum operating pool." Another critical element of the option selected by the Corps is the in-season management process which allows operational decisions to be adjusted to meet current circumstances and to take into account problems carrying out the basic programs outlined through the Technical Management Teams.

The 1995 Record of Decision contains a discussion of state water quality standards with respect to dissolved gas. AR 95–5 at 298. The Statement of Decision summarizing the 1995 Record of Decision recognizes the obligation of the Corps to meet its statutory obligations under the Endangered Species Act and Indian treaty rights. *Id.* at 312. The 1995 Record of Decision contains no reference to the Clean Water Act and no reference to the water temperature standards. Similarly, the 1998 Record of Decision contains a

section on spill and dissolved gas but makes no reference to the Clean Water Act and no reference to water temperature standards. AR 98–421 at 8516–17.

*The Administrative Record*

The administrative record submitted by the parties contains a number of documents which address violations of the water quality standards for temperatures and dissolved gases associated with the operation of Corps hydropower facilities in the lower Snake River. Many of the documents contained in the administrative record reference exceedences of water quality standards for the State of Washington. All of the documents referenced in this opinion are contained in the relevant administrative record. Documents outside of the administrative record have not been relied upon by this court.

On August 11, 1994, James R. Nielsen from the Columbia River Policy Coordination Group of the Washington Department of Fish and Wildlife wrote to the Washington Department of Ecology as follows:

> The Washington Department of Fish and Wildlife appreciates the opportunity to provide input to the Department of Ecology's triennial review of surface water quality standards. We have reviewed the five major issues identified in the announcement dated July, 1994 and at this time we concur with your assessment that these are the highest priorities for inclusion in the process.

> We are especially interested in issue D, short-term modifications of water quality criteria, from the standpoint of operation of the hydropower dams on the mainstem Snake and Columbia rivers. We are hesitant to recommend a permanent, state-wide modification of the dissolved gas saturation and water temperature standards to a higher level simply to accommodate the operation of these projects but would rather see a process put in place that allows a temporary variance for up to five years with provisions that abatement measures will be implemented to enable the projects to comply with the standard.

> Federal and public utility district hydropower projects on the mainstem Columbia and Snake rivers have consistently violated state water quality standards for temperature and dissolved gases in the past. In the spring of 1994, the operators became concerned with complying with the 110% gas saturation standard because they were being required to spill for fish passage purposes, not hydropower operations. In short, they were using the standard as an excuse to reduce spill. . . . *A number of the projects in the lower mainstem and the Snake are presently in violation of the water temperature standards as well, yet no effort is being made by the Corps of Engineers to obtain a variance or to alleviate the problem. We believe that a violation of the standards is a violation, regardless of why it happens. The Corps of Engineers' concern with meeting standards only when operations are intended for fish protection is inconsistent, to say the least.*

> Our goal is to allow the use of significant amounts of spill for juvenile passage while controlling gas supersaturation, even at low flow conditions, and to control the adverse effects of reservoirs on water temperatures in the late summer and fall. We are fully aware that the dam operators can control supersaturation by limiting spill at moderate to low flows by maximizing powerhouse operations, but they are still subject to the standards at what would be considered very high flow levels, up to the 7–day duration, 10–year flood event. According to the information you provided me earlier this year, the Corps of Engineers would have to comply with the gas saturation standard at Ice Harbor Dam at flows of up to 245,000 cubic feet per second (cfs), for example, a flow that would require substantial spill even if

the powerhouse was operated at its maximum capacity of about 120,000 cfs.

AR 95–1356 at 47058–59 (emphasis added).

Other documents in the administrative record prior to the 1995 Record of Decision address the concerns of other agencies over high water temperatures in the lower Snake River. *See, e.g.,* Bonneville Power Administration, AR 95–1039 at 32469uu (November 10, 1994); Northwest Planning Council AR 95–1067 at 33605–06 (August 16, 1994).

On March 2, 1995, the National Marine Fisheries Service issued an "Endangered Species Act—Section 7 Biological Opinion; Reinitiation of Consultation on 1994–1998 Operation of the Federal Columbia River Power System and Juvenile Transportation Program" (hereinafter referred to as the "1995 BiOp"). This 1995 BiOp was intended to constitute a substantial step in a coordinated effort on behalf of the federal government to halt and reverse the declines of endangered Snake River salmon stocks and other declining Pacific salmon stocks.

The 1995 BiOp states that "NMFS has estimated that of the ten million historical losses of salmon and steelhead, eight million, or 80%, is attributable to hydropower development and operation." Declaration of Kristen L. Boyles in Support of Plaintiffs' Motion for Summary Judgment, Exh. 1, p. 4. The 1995 BiOp explains:

[R]educed flow through reservoirs has contributed to the decline of all three listed species of Snake River salmon. Slow passage through reservoirs increases the exposure time of juvenile salmon to predation, to higher temperatures (which increase the predation rate and susceptibility of salmon to disease), and to water quality problems such as dissolved gas supersaturation, which can sometimes occur as a result of project operations.

*Id.* at 38.

The 1995 BiOp concluded that the proposed Federal Columbia River Power System Operations would jeopardize listed Snake River spring/summer and fall chinook and Snake River sockeye salmon. Based upon this jeopardy finding, the 1995 BiOp included a "Reasonable and Prudent Alternative" calling for specific spill for fish regimes in the lower Snake and Columbia Rivers, which the National Marine Fisheries Service concluded would avoid jeopardy if followed.

On March 10, 1995, the Corps issued a "Record of Decision; Reservoir Regulation and Project Operation; 1995 and Future Years" documenting the decision of the Corps to implement existing and modified plans related to reservoir regulation and project operation for Corps projects, including the Lower Granite, Little Goose, Lower Monumental and Ice Harbor "in 1995 and future years with the potential to improve survival conditions for salmon and sturgeon listed under the Endangered Species Act." AR 95–5 at 292. This 1995 Record of Decision adopted the Federal Columbia River Power System Operations 1995 BiOp, and the Reasonable and Prudent Alternative measures contained therein which include immediate, intermediate, and long-term actions concerning the operation and configuration of the Federal Columbia River Power System. The 1995 Record of Decision requires the Corps to adjust the spill water over the dams in the Snake River in order to increase fish passage efficiency and survival at those dams. The 1995 Record of Decision states, in part:

**Water Quality**

The RPA [Reasonable and Prudent Alternative] proposes spill for juvenile salmon at all eight mainstem projects on the lower Snake and Columbia Rivers. The RPA includes spill to achieve 80 percent fish passage efficiency (FPE) for salmon at all projects, except that spill at Lower Granite, Little Goose and Lower Monumental would be based on Snake River flows i.e., more juveniles would be transported in low flow conditions and less juveniles in

higher flow conditions. Spill would also be subject to a TDG [Total Dissolved Gas] limit. NMFS, in their RPA, indicated this TDG limit should be either 115 percent measured at the forebay or the state water quality standard of 110 percent. Also included in the RPA is a comprehensive monitoring and evaluation program which would provide real-time information on physical and biological parameters so that spill adjustments can be made.

Spill at Dworshak occurred in past years in order to meet salmon flow objectives. Voluntary spill at Dworshak will produce TDG levels that exceed the state water quality standard of 110 percent. The Corps expressed concerns about exceeding current state water quality standards in the Supplemental Biological Assessment. Also, in a letter dated November 9, 1994, from Major General Ernest J. Harrell (Corps) to Federal agencies, the states, and other regional interests he indicated the Corps would attempt to adhere to the state water quality standards, in so far as physically possible, in operating its projects, and that requests to exceed state standards should be fully coordinated with the appropriate states by the requesting agency.

At the time of the signing of the ROD, it is the Corps' understanding that the proposed spill which would exceed current state standards is being discussed by NMFS with the appropriate state agencies. Also, it is the Corps' understanding that a plan for the monitoring and evaluation program is scheduled to be completed by NMFS on March 10, 1995. The Corps is prepared to implement spill if the appropriate coordination with water quality agencies has been completed and an adequate monitoring and evaluation program is operational prior to implementation.

AR 95–5 at 303.

In November of 1995, the Final Environmental Impact Statement for a "System Operation Review" for the Federal Columbia River Power System, including the four lower Snake River dams, was released referencing the Clean Water Act and the effects of different operational strategies on water quality. Defendant's Excerpts from Administrative Record, Exhibit 3, Main Report, pp. 11–12.

Documents in the administrative record from 1995 and 1996 continued to raise the concerns of organizations and agencies over high water temperatures in the lower Snake River reservoirs, for example, the Columbia River Inter–Tribal Fish Commission, AR 95–1486 at 50475–76 (April 7, 1995), and the National Marine Fisheries Service, AR 96–104 at 2123 (March 8, 1996).

Beginning in 1996, the EPA, charged with the implementation and enforcement of the Clean Water Act, began a specific dialogue with the Corps regarding temperature exceedences associated with the operation of the Corps hydropower facilities on the lower Snake River. On August 12, 1996, the Regional Administrator of the EPA wrote to General Russell L. Furhman of the Corps, in part, as follows:

In recent weeks, the Environmental Protection Agency (EPA) has received several inquiries about exceedences of temperature water quality standards in the mainstem Columbia and lower Snake rivers, associated with the operation of the Corps of Engineers hydropower facilities. *Specifically, lower Snake River temperatures have recently exceeded federally approved State water quality temperature standards of 20 –(68 % F) at fish handling facilities and throughout the river.* The purpose of this letter is to initiate a dialog [sic] about your perspective on the temperature issue and seek solutions to this problem. . (This letter focuses on the temperature standard. However, due to the extensive history of concerns regarding the total dissolved gas (TDG) standard, we would like to include TDG issues in future discussions.)

Seasonal maximum water temperatures above permissible limits have been documented for a number of years resulting in the mainstem Snake and Columbia rivers being put on the Clean Water Act Section 303(d) list of water quality impaired waterbodies. These exceedences pose a significant risk to designated beneficial uses. The designated uses of concern are adult salmon that face thermal barriers to upstream migration and outmigrating juvenile salmon that are highly susceptible to the sublethal and lethal effects of elevated temperatures. Elevated summer and fall temperatures have been shown to be a significant limiting factor in the overall survival of Snake and Columbia Rivers salmon.

.      .      .      .      .

*It is our understanding that several structural and/or operational options exist to remedy these exceedences and better protect juvenile and adult salmon. EPA believes that continued exceedences of established temperature standards is [sic] inconsistent with the Clean Water Act and the Endangered Species Act ....* Combinations of corrective actions on the land and in the river are needed to protect our valuable salmon resources.

AR 96–498 at 7900–01 (emphasis added).

A "Memorandum for the Record" on "Water Temperature Issues" by Corps personnel dated October 16, 1996 contained in the administrative record examines the letter of August 12, 1996 to General Furhman. The memorandum notes that state water temperature standards have been exceeded "before and after the dams" and sets forth a list of recommended solutions mainly geared toward increasing fish survival. AR 98–636 at 11578.

On October 21, 1996, the Corps attended a meeting in Portland, Oregon to discuss temperature issues in the lower Snake and Columbia Rivers with a number of participating state and federal organizations.

AR 98–212. The meeting was called to "discuss and share information about temperature criteria exceedences in the lower Snake and Columbia Rivers and the classification of a number of segments of the Snake and Columbia Rivers as Water Quality Limited Segments under Section 303(d) of the Clean Water Act." *Id.* at 6012. The desired outcome of the meeting was to discuss the "[i]nitiation of a process for long-term resolution of the temperature problems in these rivers." *Id.* The meeting notes state, in part: "INFORMATION RELATIVE TO THE IMPACT OF ELEVATED TEMPERATURE IN THE LOWER SNAKE AND COLUMBIA RIVERS ... Corps is aware of the temperature problem, and its policy is to meet state water quality standards when it can." *Id.* at 6013. The notes further state that the Corps is "aware that the 72F of 1996 does not meet WA/OR water quality standards." *Id.* at 6014.

Throughout 1997, discussions of temperature exceedences in the lower Snake River as well as the requirements of the Clean Water Act continued between the EPA and the Corps. *See, e.g.,* AR 98–131 at 4140–41 (Minutes of Executive Committee Meeting of July 23, 1997).

Measures to reduce water temperatures were considered by the Corps on an ongoing basis at Technical Management Team meetings. In a Technical Management Team meeting on January 17, 1997, the Corps summarized the issues of "Appropriate Plan to Guide In-season Management" and "In-season Decision Making and Conflict Resolution" to be addressed in the upcoming management season to include the issues of water temperature and dissolved gas. AR 96–320 at 5050. One possible solution identified to aid in temperature control was the timely release of summer drafts of cold water from Dworshak Reservoir. *See* AR 98–203 at 5937 (Technical Management Team Meeting of February 11, 1997). On May 1, 1997, a separate management team was created to address temperature. "This

team will be facilitated by EPA as a way to address the need for the Federal Columbia River Hydropower System to meet water quality standards promulgated under the Clean Water Act." AR 98–165 at 4948.

On November 6–7, 1997, a "water temperature workshop" was convened in Portland, Oregon by a number of federal agencies, including the Corps, to promote information exchange on ecosystem management of the Columbia River system, including the lower Snake River, with focus on mainstem water temperature. A report by the Corps entitled "What Have We Done to Reduce Water Temperature at COE Reservoirs and Dams?" contained an account of the operational actions taken by the Corps to reduce water temperature at its projects, including the release of cool water from Dworshak Reservoir. AR 98–64 at 2477.

On December 9, 1997, the Regional Administrator of the EPA, the Director of the Washington Department of Ecology, and the Director of the Oregon Department of Environmental Quality jointly wrote to the Commander of the North Pacific Division of the Corps, in part, as follows:

Dear General Griffin:

Water quality standards have been developed by the states under the authority of the federal Clean Water Act to restore and maintain the chemical, physical, and biological integrity of the waters of the United States. Standards, established and promulgated by the states, are scientifically based and specifically designed to protect aquatic life and to provide conditions suitable for sustaining healthy aquatic ecosystems. *In that regard, it is imperative that appropriate measures be implemented as soon as possible to reduce the likelihood that levels of total dissolved gas will exceed the legally established water quality standard of 110% and that water temperature exceed the standard of 68 degrees F for mainstem Columbia/Lower Snake River.*

*The water quality standard for maximum water temperature and the total dissolved gas standard are commonly exceeded, often by substantial amounts in both rivers.* Maintaining these and other critical parameters at levels meeting water quality standards is an important element of salmon recovery and promoting the general health of the Columbia and Snake River ecosystems.

As a region, we must keep in mind that the states, the tribes, the U.S. Environmental Protection Agency (EPA) and the various public and private sector economic interests currently invest millions of dollars to comply with water quality standards in Columbia and Snake River tributaries. To ensure that these salmon restoration efforts are not wasted, we must make a concomitant effort to meet water quality standards in the Columbia/Snake mainstem. *To that end it is important for us to enforce water quality standards for the mainstem as well as for the tributaries and to develop a schedule and milestones for structural improvements and modified operations at the dams to comply with water quality standards.*

. . . . .

We are very interested in working with the Corps and all other federal and non-federal entities, with responsibility for managing hydropower facilities on the Columbia and Snake Rivers, to develop a long term strategy to comply with water quality standards. In the case of Total Dissolved Gas, this strategy must identify the actions needed to comply with water quality standards below the dams. In the case of temperature, dams are one of many factors that contribute to exceedences. The strategy must identify the actions needed to ensure that the dams do not contribute to water quality standards exceedences. By March 15, 1998, please submit the following to EPA, Oregon Department of Environmental Quality, and Washington Department of Ecology:

1. The actions to be taken at the dams to ensure compliance with water quality standards for Total Dissolved Gas.

2. The actions to be taken at the dams to eliminate to the extent possible the impacts of the dams on water temperature, in order to meet water quality standards for temperature in the Columbia/ Snake mainstem.

3. Milestone dates for completion of these operational and structural modifications.

4. A compliance schedule with intermediate milestone dates.

5. A detailed budget for making the necessary alterations to comply with the Clean Water Act.

We encourage the Corps to move rapidly ahead with implementation of the gas abatement program and with efforts to address the temperature standard....

AR 98–498 at 10095–96 (emphasis added).

On March 13, 1998, Brigadier General Robert H. Griffin of the Corps wrote to the Regional Administrator of the EPA, in part, as follows:

I am writing in response to your letter dated December 9, 1997, also signed by Mr. Tom Fitzsimmons, Director of the Washington Department of Ecology (DOE) and Mr. Langdon Marsh, Director of the Oregon Department of Environmental Quality (DEQ). You requested information on the Corps of Engineers' plans to reduce total dissolved gas (TDG) levels and water temperature related to the construction, operation and maintenance of dam and reservoir projects in the Columbia River Basin.

As I indicated in our December 19, 1997 meeting, the Corps shares the regional goal to control TDG levels and water temperatures in the Columbia River Basin for protection of aquatic resources....

A number of teams established in the context of the NMFS regional forum ... are tasked with describing and managing water quality issues associated with implementation of the biological opinions as well as the operation of the projects on the lower Snake and Columbia rivers....

*As you know, the Corps' policy is to meet all applicable water quality standards insofar as practicable and physically possible. In this regard, we have made operational and structural changes to our projects over the past three decades to improve water quality.* To control TDG, the Corps has added flow deflectors to all but one of our lower Columbia and Snake River mainstem dams (The Dalles). More recently, we have embarked on a multi-year, multi-million dollar dissolved gas abatement study to learn more about gas dissipation below our projects and to formulate gas abatement alternatives. We have been monitoring TDG on a real-time basis since 1984, and we plan to add two more monitoring stations in 1998, one above McNary on the Columbia and the other above Lower Granite on the Snake River.

Water temperature is an area with relatively few opportunities for mainstem solutions. Our storage projects on the Columbia and Snake rivers, Libby and Dworshak, are equipped with selective withdrawal facilities which permit us to alleviate water temperature extremes in the tributaries. For example, during the past ten years, we have provided cool water from Dworshak Reservoir to lower temperatures in the lower Snake River in the summer....

AR 98–455 at 8758–59 (emphasis added).

On June 15, 1998, the EPA, the Oregon Department of Environmental Quality, the Washington Department of Ecology, and the Idaho Division of Environmental Quality wrote once again to Brigadier General Griffin of the Corps stating, in part, as follows:

This letter is a follow-up to our meeting on March 16, 1998. . . . We are writing to express the understanding of EPA and the states of Idaho, Oregon, and Washington as a result of the meeting so that we can continue to work together on Columbia River salmon and ecosystem restoration.

First, we agreed that the U.S. Army Corps of Engineers does have the responsibility to do its part to meet the Clean Water Act requirements in the mainstem. . . .

Second, for dissolved gas, we agreed that we would scope out agreement and disagreement. . . .

Third, we agreed that temperature is a more difficult and diffuse issue which requires a more deliberate path for analysis, agreement, and implementation. EPA is conducting a Columbia/Snake River mainstem temperature assessment which will more clearly define the relationship between tributary and mainstem temperature inputs and help focus future work efforts on temperature. . . . We must continue to look for near term opportunities to improve water temperature. . . .

AR 98–426 at 8550–51.

On June 24, 1998, the Corps issued a "Record of Consultation and Summary of Decision: Federal Columbia River Power System Operations and System Configuration" which "adopt[ed], incorporat[ed] and reaffirm[ed] the [1995] Record of Decision (ROD)." AR 98–421 at 8512. This record of consultation and summary of decision documented the decision of the Corps to implement certain operations and action related to the operation and configuration of the projects of the Federal Columbia River Power System, including the Ice Harbor, Lower Monumental, Little Goose, and Lower Granite. The 1998 Record of Decision explains the operations as follows:

The operations described below support recovery of ESA-listed species as outlined in the NMFS' and USFWS' 1995 Biological Opinions, specifically the Reasonable and Prudent Alternative and the Incidental Take Statement contained in these documents, and the 1998 Supplemental Biological Opinion. Further, it is consistent with the Juvenile Fish Transportation Program contained in the Section 10 permit issued to the Corps for that activity by NMFS.

The operation adopts the adaptive management approach. Under this approach, operations may be modified inseason and/or year-to-year based upon new scientific information or to support studies for long-term configuration changes through the RPA 26 framework process. The regional forum provides for discussions and procedures to assist in decisions on modifications of measures. A Technical Management Team will make in-season recommendations to the Corps based on runoff conditions, fish migration and other factors. There are also various regional groups within the forum, such as the Implementation Team, where system operations are proposed and discussed. The Corps will continue to coordinate through the regional forum with NMFS, USFWS, NPPC, states, and Tribes on different proposed reservoir operations in the regional forum TMT process and consider TMT recommendations in making final decisions on the operation of Corps projects. . . .

Id. at 8520.

The 1998 Record of Decision references spill on the lower Snake River dams, which would exceed state water quality standards, but does not refer to the requirements of the Clean Water Act or state water temperature standards.

## CONTENTIONS OF THE CORPS

Initially, the Corps contends that the court should stay further proceedings in this case until a new Record of Decision is issued. The Corps contends that a new Record of Decision is expected in the

spring of 2001, and that the concerns the plaintiffs express will likely be addressed.

The Corps contends that at no time has it argued as a defense in this case that the Corps is not required to comply with water quality standards as a matter of law. The Corps contends that the administrative record submitted to this court clearly establishes that at all relevant times, the Corps has made extensive efforts to meet state water quality standards by carrying out significant programs and studies. The Corps contends that the plaintiffs' arguments are fundamentally misplaced because they focus on whether water quality standards have been met, rather than on the reasonableness of the decisions of the Corps in the 1995 Record of Decision and the 1998 Record of Decision.

The Corps contends that the plaintiffs inaccurately attribute all of the water quality exceedences at the dams to the decisions made by the Corps in the 1995 Record of Decision and the 1998 Record of Decision. The Corps further contends that the plaintiffs are asking the court to exceed its jurisdiction under the Administrative Procedures Act by seeking review of impacts to water quality beyond those attributable to the challenged 1995 Record of Decision and the 1998 Record of Decision and by seeking relief directed at the overall operation of the dams rather than at the 1995 Record of Decision and the 1998 Record of Decision.

The Corps contends that the administrative record shows that the challenged 1995 Record of Decision and the 1998 Record of Decision are reasonable in light of the options available when the decisions were made. The Corps contends that the decisions in the 1995 Record of Decision and the 1998 Record of Decision are not arbitrary or capricious decisions or otherwise not in accordance with the law and are indeed supported by the administrative record in this case.

Intervenor-defendants Potlatch and Northwest Pulp and Paper Association, joined by all other intervenor-defendants,

contend that the administrative record demonstrates that the Corps has made extensive efforts to comply with water quality standards. In addition, intervenor-defendants contend that water quality standards are not enforceable, and that this court should dismiss this case in light of the ongoing administrative process to amend the current Record of Decision.

## CONTENTIONS OF THE PLAINTIFFS

The plaintiffs contend that the Corps has violated and is continuing to violate the Clean Water Act and the Administrative Procedures Act by taking final agency action that fails to comply with numeric, narrative, and antidegradation criteria of the water quality standards of the State of Washington for temperature and dissolved gas. The plaintiffs ask the court to declare that the Corps is in violation of the Clean Water Act and to order the Corps to develop a schedule for compliance.

The plaintiffs contend that the Corps acted contrary to law in issuing the 1995 Record of Decision and the 1998 Record of Decision without complying with the water quality standards promulgated by the State of Washington under the Clean Water Act. The plaintiffs contend that the administrative record demonstrates that the Corps was aware that the operation of the dams and their reservoirs caused violations of the applicable water quality standards for temperature and dissolved gas. The plaintiffs contend that the operation of the dams and their reservoirs continues to cause violations of numeric and narrative state water quality standards, and that this court should declare the 1995 Record of Decision and the 1998 Record of Decision to be final agency action which is arbitrary, capricious, and not in accordance with the law.

Intervenor-plaintiff Nez Perce Tribe of Idaho (Nez Perce Tribe) contends that the evidence from the administrative record for the 1995 Record of Decision and the

1998 Record of Decision demonstrates that the final actions of the Corps violate applicable water quality standards. The Nez Perce Tribe contends that only a ruling from this court that the Corps is and has been in violation of the Clean Water Act will ensure that the Corps will operate its facilities in compliance with all of its legal responsibilities.

## APPLICABLE LAW

*Legal Obligation of the Corps Under the Clean Water Act*

▮ Review under the Administrative Procedures Act requires references to the legal duty set forth in the governing substantive statute. *See, e.g., Oregon Natural Resources Council v. Thomas*, 92 F.3d 792, 798–99 (9th Cir.1996). The United States Court of Appeals for the Ninth Circuit has repeatedly concluded that the Clean Water Act requires federal facilities and federal activities to comply with state water quality standards. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1153 (9th Cir.1998) ("Under the Clean Water Act, all federal agencies must comply with state water quality standards .... 33 U.S.C. § 1323(a)."); *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1424 (9th Cir.1989) ("The [Clean Water Act] also requires states to implement water quality standards with which federal agencies must comply. *See* 33 U.S.C. §§ 1313, 1323."); *Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 848 (9th Cir.1987) ("The [Clean Water Act] requires each state to develop and implement water quality' standards to protect and enhance the quality of water within the state. 33 U.S.C. § 1313. The Act also requires all federal agencies to comply with all state requirements. 33 U.S.C. § 1323.")

*Legal Obligation of the Corps Under the Administrative Procedures Act*

This court must determine whether the actions of the Corps were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In determining whether the 1995 Record of Decision and the 1998 Record of Decision regarding the operation of the dams were arbitrary and capricious, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

The focal point for judicial review is the administrative record already in existence. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power*, 470 U.S. at 744, 105 S.Ct. 1598.

▮ The United States Supreme Court has repeatedly emphasized that a reviewing court may not substitute its judgment for that of the agency. *Arkansas v. Oklahoma*, 503 U.S. 91, 113–14, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992); *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 44, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

## ANALYSIS

The 1995 Record of Decision and the 1998 Record of Decision represent final agency actions and are subject to review under the Administrative Procedures Act.

The court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

In evaluating the reasonableness of these decisions, the court must consider the legal obligations of the Corps under all of its statutory mandates, including the Clean Water Act. The Corps agrees that it was required to "take steps to see that the spill and other regimes implemented to comply with the [Endangered Species Act] are consistent with the requirements of the Clean Water Act." Defendant's Reply Memorandum in Support of Defendant's Second Motion for Summary Judgment or for a Stay of this Case, p. 8. The compliance of the Corps with its legal obligations under the Clean Water Act is a relevant factor in determining whether the final agency actions taken by the Corps in the 1995 Record of Decision and the 1998 Record of Decision were arbitrary and capricious or otherwise not in accordance with law.

It is not possible to conclude that the Corps complied with its legal obligations under the Clean Water Act when it made the decisions in the 1995 Record of Decision and the 1998 Record of Decision based upon a review of the decisions themselves. The 1995 Record of Decision and the 1998 Record of Decision do not explicitly address the legal obligations of the Corps under the Clean Water Act. The Corps offers a variety of arguments to explain its legal obligations under the Clean Water Act in the 1995 Record of Decision and the 1998 Record of Decision.

*Endangered Species Act was the Real Issue*

The Corps candidly explains that the principal issue before the Corps when it prepared the 1995 Record of Decision and the 1998 Record of Decision was the operation of the Federal Columbia River Power System to avoid jeopardizing salmon species protected by the Endangered Species Act. The Corps contends that the deci-

sions made in the 1995 Record of Decision and the subsequent 1998 Record of Decision best met its obligations under the Endangered Species Act, and therefore the reasonableness and adequacy of the Corps' decision must be sustained.

The Corps agrees that "[a]ll of the statutes applicable to the operation of the [Federal Columbia River Power System] must be observed by the Corps in making decisions for the operation of that system." Defendant's Memorandum in Response to Plaintiffs' and Intervenor Nez Perce Tribe's Second Motions for Summary Judgment and in Support of Defendant's Second Motion for Summary Judgment or for a Stay of this Case, pp. 20–21. However, the Corps contends that other laws, including the Clean Water Act, were not the principal focus of the ongoing litigation over the dam operations. The Corps argues that:

> the [Administrative Procedures Act] certainly does not require the Corps to encompass all of its compliance activities in a decision on how to operate the Federal Columbia River Power System in order to meet its obligations under the Endangered Species Act. Thus, in arriving at the decisions in the 1995 and 1998 [Records of Decision], the Corps need not address any alleged exceedences of Washington state water quality standards that do not relate to that decision; rather, it need only take steps to see that the spill and other regimes implemented to comply with the [Endangered Species Act] are consistent with the requirements of the Clean Water Act.

Defendant's Reply Memorandum in Support of Defendant's Second Motion for Summary Judgment or for a Stay of this Case, p. 8.

The plaintiffs contend that the "Records of Decision prepared by [the Corps] in 1995 and 1998 for the operation of four hydropower dams on the lower Snake River are arbitrary, capricious and not in

accordance with law because they do not take necessary and available steps to correct existing violations of state water quality standards caused by operation of these dams." Plaintiffs' Reply Memorandum in Support of Second Motion for Summary Judgment and in Opposition to Defendant and Intervenor–Defendants' Motions, p. 1. The plaintiffs contend that the Corps has a straightforward legal duty to comply with state water quality standards in its decisions for the operation of the four Snake River dams.

The 1995 Record of Decision begins with the following introduction:

> This record documents the decision of the U.S. Army Corps of Engineers (Corps) to implement existing and modified plans related to reservoir regulation and project operation for Dworshak, Lower Granite, Little Goose, Lower Monumental, Ice Harbor, Libby, Albeni Falls, Chief Joseph, McNary, John Day, The Dalles and Bonneville projects in 1995 and future years with the potential to improve survival conditions for salmon and sturgeon listed *under the Endangered Species Act (ESA)* . . . .

AR 95–5 at 292 (emphasis added). While the express purpose of the 1995 Record of Decision and the subsequent 1998 Record of Decision was to comply with the legal obligations of the Corps under the Endangered Species Act, the Endangered Species Act and the Clean Water Act "should be read together, so that compliance with one statute does not come at the expense of the other." Defendant's Memorandum in Response to Plaintiffs' and Intervenor Nez Perce Tribe's Second Motions for Summary Judgment and in Support of Defendant's Second Motion for Summary Judgment or for a Stay of this Case, p. 20.

The 1995 Record of Decision and the subsequent 1998 Record of Decision represent the general plan of the Corps for operation of the Federal Columbia River Power System, including the four lower Snake River dams. The administrative record establishes that the operation of the lower Snake River dams in compliance with state water quality standards was a significant issue repeatedly raised with the Corps by a number of federal and state agencies, as well as private groups. The administrative record establishes that the execedences of state water quality standards in the lower Snake River are affected by decisions made in the 1995 Record of Decision and the 1998 Record of Decision regarding the operation of the dams; for example, voluntary spill, spillway deflector modifications, and Dworshak Reservoir releases. Even though compliance with the Endangered Species Act was the principal issue in the 1995 Record of Decision and the 1998 Record of Decision, the Corps does not dispute that it was required to take necessary steps to see that these final agency actions implemented to comply with the Endangered Species Act were consistent with its legal obligations under the Clean Water Act. While the Corps took action to comply with its legal obligations under the Endangered Species Act, it was not free to do so without considering compliance with its legal obligations under the Clean Water Act.

*Violations of State Water Quality Standards*

The Corps contends that it did not cause any violations of state water quality standards in the 1995 Record of Decision and the 1998 Record of Decision. The Corps contends that the plaintiffs "merely continue to equate the undisputed fact that there are execedences of water quality standards in the Snake and Columbia Rivers with proof that the Corps is responsible for those execedences." Defendant's Memorandum in Response to Plaintiffs' and Intervenor Nez Perce Tribe's Second Motions for Summary Judgment and in Support of Defendant's Second Motion for Summary Judgment or for a Stay of this Case, p. 5.

The Corps contends that the plaintiffs have no evidence from the record that the challenged decisions themselves result in execedences of water quality standards.

The Corps contends that all of the evidence relied upon by the plaintiffs to allege temperature exceedences relates not to Corps dams operations, but to the fact that the dams exist. The Corps contends that the plaintiffs cite only to effects on temperatures caused by the presence of reservoirs and their alteration of flow regimes which are not properly attributable to operations of the Corps.

The plaintiffs contend that the efforts by the Corps to draw a rigid distinction between the effects of the existence of the lower Snake River dams on water quality and the effects of the decisions of the Corps regarding the operation of the dams is factually incorrect and legally irrelevant. The plaintiffs contend that the Corps' own record shows that there are operational measures and structural modifications that can either reduce, leave unchanged, or increase the violations of state water quality standards.

In *Idaho Dep't of Fish and Game v. National Marine Fisheries Serv.*, 850 F.Supp. 886 (D.Or.1994), the Honorable Malcolm F. Marsh rejected a similar argument made by the intervenor-defendants in a case involving the Endangered Species Act. The intervenor-defendants asserted that any analysis of the scope of hydropower operations on salmon mortality must distinguish mortality attributable to the physical existence of the dams from the annual hydropower operation of the dams. Judge Marsh rejected this approach, noting that "such a distinction does not appear in the record before the court." *Id.* at 894. The court noted that "[t]he idea that the dams are immutable and uncontrollable like the weather ignores decades of fish protection improvements (such as bypass facilities and ladders) and other structural and operational enhancements." *Id.* The court explained that "the [Endangered Species Act] places no temporal limits on the types of actions (i.e. past or present) which may be considered by an agency in proposing 'reasonable and prudent alternatives,' or measures. Thus,

operational changes as well as systemic or facility changes to the dams' existence may well be available." *Id.*

The court accepts the position of the Corps that dam operations are not the sole cause of the exceedences of state water quality standards in the lower Snake River. However, a review of the administrative record convinces the court that the operation of the dams on the lower Snake River has a significant effect on the exceedences of state water quality standards. The administrative record In this case continually refers to operational changes to the Corps' hydropower facilities intended to address violations of water quality standards at the lower Snake River dams. *See, e.g.,* AR 98–636 at 11579 ("recommended solutions mainly geared towards increasing fish survival"); and AR 98–64 at 2477 ("What Have We Done To Reduce Water Temperature at COE Reservoirs and Dams?").

On December 9, 1997, the Regional Administrator of the EPA, the Director of the Washington Department of Ecology, and the Director of the Oregon Department of Environmental Quality wrote to the Commander of the North Pacific Division of the Corps, expressing that "water quality standard for maximum water temperature and the total dissolved gas standard are commonly exceeded, often by substantial amounts in both rivers." AR 98–498 at 10095. These agency representatives stated that "it is important for us to enforce water quality standards for the mainstem as well as for the tributaries and to develop a schedule and milestones for structural improvements and modified operations at the dams to comply with water quality standards." *Id.*

On March 13, 1998, the Commander of the North Pacific Division of the Corps responded, stating that "the Corps' policy is to meet all applicable water quality standards insofar as practicable and physically possible. In this regard, we have made operational and structural changes to our projects over the past three decades to

improve water quality." AR 98–455 at 8759. The Corps has offered no evidence in the administrative record to support its assertion that dam operations and structural modifications do not affect the exceedences of state water quality standards or that dam operations and structural modifications cannot affect exceedences of water quality standards.

*The Corps Considered the Clean Water Act and Therefore Complied*

The Corps contends that it did comply with the Clean Water Act, in that, it considered all relevant factors and laws and made reasonable decisions. The Corps contends that it is appropriate for this court to review the Records of Decision at issue to determine if decisions were made that were incompatible with water quality standards of the State of Washington but contends that the administrative record shows that the Corps did not ignore state water quality standards in developing its Records of Decision.

The Corps contends that the administrative record demonstrates the sustained, long-term efforts by the Corps to improve water quality in the Snake and Columbia Rivers. The Corps contends that the law does not require that the Corps articulate how it will comply with temperature and dissolved gas standards. The Corps asserts that "[w]hether the Corps [Records of Decision] specifically addressed a plan to meet [water quality standards], everyone knew the provisions of federal law that had to be considered by the Corps in its operations, and the administrative record reflects that the Corps consistently did so." Defendants' Memorandum in Response to Plaintiffs' and Intervenor Nez Perce Tribe's Second Motions for Summary Judgment and in Support of Defendant's Second Motion for Summary Judgment or for a Stay of this Case, p. 38.

The plaintiffs contend that a review of the administrative record reveals that the Corps knew before the 1995 Record of Decision, and certainly before the 1998 Record of Decision, that its operation of the four lower Snake River dams contributed to violations of water quality standards of the State of Washington and knew of measures that would correct these violations. The plaintiffs contend that no single document or group of documents in the administrative record explains why the Corps chose to ignore the requirements of the Clean Water Act in the 1995 Record of Decision and the 1998 Record of Decision.

The plaintiffs contend that the Clean Water Act requires the Corps to comply with state water quality standards in its decisions regarding the operation of the Snake River dams. The plaintiffs contend that this court should remand this case to the Corps to review its decisions and to make a new decision which meets the legal obligations of the Corps under the Clean Water Act.

The administrative record establishes that as early as 1994, the Washington Department of Fish and Wildlife contended that the Corps' operation of the hydrofacilities on the Snake River contributed to exceedences of water temperature and dissolved gas standards. *See* AR 95–1356 at 47058. In a letter dated August 11, 1994, the Washington Department of Fish and Wildlife criticized the actions of the Corps in meeting the requirements of the Clean Water Act and the Endangered Species Act, stating, in part:

A number of the projects in the lower mainstem and the Snake are presently in violation of the water temperature standards as well, yet no effort is being made by the Corps of Engineers to obtain a variance or to alleviate the problem. We believe that a violation of the standards is a violation, regardless of why it happens. The Corps of Engineers' concern with meeting standards only when operations are intended for fish protection is inconsistent, to say the least.

*Id.*

The administrative record contains evidence that a number of federal agencies

raised concerns with the Corps over high water temperatures and hydropower operations in the Snake River prior to the 1995 Record of Decision. *See, e.g.*, AR 95–1039 at 32469uu (November 10, 1994); and AR 95–1067 at 33605 (August 16, 1994). The Corps' draft Environmental Impact Statement on hydropower operations in July of 1994 sets forth the requirements of the Clean Water Act and state water quality standards. AR 95–1277 at 41512, 41514.

Between the Record of Decision issued on March 10, 1995 and the Record of Decision issued on June 24, 1998, the EPA, charged with the enforcement of the Clean Water Act, repeatedly and specifically brought to the attention of the Corps the violations of water quality standards which are the subject of this action. On August 12, 1996, the Regional Administrator of the EPA wrote to General Russell L. Furhman of the Corps, stating, in part, that "lower Snake River temperatures have recently exceeded federally approved State water quality temperature standards ... throughout the river," and that "[i]t is our understanding that several structural and/or operational options exist to remedy these exceedences." AR 96–498 at 7900–01. This letter states that the "EPA believes that continued exceedences of established temperature standards is inconsistent with the Clean Water Act and the Endangered Species Act." *Id.* at 7901. The administrative record demonstrates that this letter from the EPA to the Corps was recognized by and acted upon by the Corps. *See* AR 98–636 (Memorandum for the Record, October 16, 1996). On October 21, 1996, the Corps attended a meeting with representatives of a number of state and federal agencies in Portland, Oregon to discuss temperature issues in the lower Snake and Columbia Rivers. Minutes of that meeting contained in the administrative record state, in part, that the "Corps is aware of the temperature problem, and its policy is to meet state water quality standards when it can." AR 98–212 at 6013.

Discussions of exceedences of state water temperature and dissolved gas standards in the lower Snake River with the Corps continued throughout 1997 in the Technical Management Team meetings and Executive Committee meetings, and a workshop to address the issue took place with a number of federal agencies, including the Corps, in November of 1997.

On December 9, 1997, the Regional Administrator of the EPA, the Director of the Washington Department of Ecology, and the Director of the Oregon Department of Environmental Quality jointly wrote to Brigadier General Griffin, the Commander of the North Pacific Division of the Corps, stating specific concerns about exceedences of water quality standards for maximum water temperature and total dissolved gas standards in the Snake River and requesting "a schedule and milestones for structural improvements and modified operations at the dams to comply with water quality standards." AR 98–498 at 10095. In a letter dated March 13, 1998 to the Regional Administrator of the EPA, Brigadier General Griffin responded, in part, that "the Corps' policy is to meet all applicable water quality standards insofar as practicable and physically possible." AR 98–455 at 8759.

More meetings and letters on this issue as reflected in the administrative record followed. On June 24, 1998, the Corps issued the 1998 Record of Decision, the general plan for the operation of the Federal Columbia River Power System, including the four dams on the lower Snake River, without reference to compliance with its legal obligations under the Clean Water Act. Nine days earlier, on June 15, 1998, officials from the EPA, the Oregon Department of Environmental Quality, the Washington Department of Ecology, and the Idaho Division of Environmental Quality wrote a letter to Brigadier General Griffin of the Corps as a follow-up to a meeting which took place on March 16, 1998 between representatives of these agencies and the Corps "to discuss the

Clean Water Act and the Federal Columbia River Power System." AR 98–426 at 8550. The officials from these federal and state agencies recognized the importance of enforcement of current state water quality standards in the Columbia and Snake River mainstem, as well the responsibility of the Corps "to do its part to meet the Clean Water Act requirements in the mainstem." *Id.*

The administrative record demonstrates that the Corps knew of the exceedences of state water quality standards at the hydropower facilities on the Snake River, openly acknowledged these exceedences, and consistently took the position that it would comply with water quality standards when it could. The administrative record establishes that specific actions taken by the Corps in the 1995 Record of Decision and the 1998 Record of Decision affected these exceedences of state water quality standards.

The Corps correctly contends that the administrative record establishes that alleged exceedences of state water quality standards by hydropower facilities on the Snake River were considered by the Corps. However, the administrative record does not establish that the Corps has complied with its legal obligations under the Clean Water Act. The administrative record raises substantial doubt as to whether the Corps has complied with its legal obligations under the Clean Water Act.

*Stay*

The Corps contends that this court should stay or dismiss this action because the agency is scheduled to complete a new "decision document in March 2001 which will replace the 1995 ROD, 1998 ROCA-SOD and 2000 ROCASOD." Declaration of Douglas P. Arndt, p. 3. The Corps asserts that the new decision will address "Clean Water Act objectives" and will likely address concerns that the plaintiffs express in this action. *Id.* The Corps contends that a stay will avoid the waste of judicial resources.

The plaintiffs and the intervenor-plaintiff contend that this court should not be stayed based upon a promised future action. The plaintiffs contend that the promise of a new decision does not provide a factual or legal basis to stay this action.

This case could become moot upon the issuance of a decision which replaces the 1995 Record of Decision and the 1998 Record of Decision. Since there is no such decision as of this date, the court concludes that a stay or dismissal is not warranted by the facts or the law. It is not a waste of judicial resources to resolve this case which raises significant issues and has been pending for two years.

## CONCLUSION

■ Based upon a review of the administrative record, this court can only conclude that at least by June 24, 1998, when the 1998 Record of Decision was issued by the Corps, it was a clear error of judgment by the Corps not to address compliance with its legal obligations under the Clean Water Act. This court concludes that the administrative record does not establish that the agency considered all relevant factors in making the 1998 Record of Decision and does not support the agency action, rendering this final agency action arbitrary and capricious.

■ The Corps correctly asserts that this is not an enforcement action under the Clean Water Act. The proper course is to remand to the agency for additional investigation and explanation. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

## RULING OF THE COURT

The ruling of the court is as follows:

1. Plaintiffs' second motion for summary judgment (# 150) is granted;

2. Intervenor–Plaintiff Nez Perce Tribe of Idaho's second motion for summary judgment (# 144) is granted;

3. The Corps' second motion for summary judgment or a stay (# 162) is denied; and

4. Intervenor–Defendants Potlatch and Northwest Pulp and Paper Association's second motion for summary judgment (# 170) is denied.

The Corps shall issue a new decision replacing the 1998 Record of Decision which addresses its compliance with its legal obligations under the Clean Water Act within sixty days of the order of summary judgment.