**In re U.S. AGGREGATES, INC. SECURITIES LITIGATION.**

**No. C 01–01688 CW.**

United States District Court,
N.D. California.

Aug. 14, 2002.

Brian R. Blackman, David R. Ongaro, Schnader, Harrison, Segal & Lewis LLP, Robert C. Gebhardt, Alec H. Boyd, Arter & Hadden, LLP, San Francisco, CA, Howard S. Caro, Michael L. Charlson, Heller, Ehrman, White & McAuliffe LLP, Menlo Park, CA, Mindy G. Davis, Donna M. Drake, Howrey, Simon, Arnold & White, LLP, Washington, DC, Rachel M. Jones, Heller, Ehrman, White & McAuliffe, Peter J. Koenig, Arter & Hadden LLP, San Francisco, CA, Sarah R. Marmor, James C. Munson, Kirkland & Ellis, Chicago, IL, Kirk A. Paisich, Howrey, Simon, Arnold & White, LLP, Los Angeles, CA, Carl Edward Switzer, Heller, Ehrman, White & McAuliffe LLP, Menlo Park, CA, for defendants.

Francis A. Bottini, Jr., Francis M. Gregorek, Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, Gustavo, Bruckner, Wolf, Haldenstein, Adler, New York City, Nadeem Faruqi, Faruqi & Faruqi, New York City, Brian M. Felgoise, Law Offices of Brian M. Felgoise, Philadelphia, PA, Paul J. Geller, Cauley, Geller, Bowman & Coates LLP, Boca Raton, FL, Marc S. Henzel, Law Offices of Marc S. Henzel, Philadelphia, PA, Shirley H. Huang, Milberg, Weiss, Bershad, Hynes & Lynch LLP, San Francisco, CA, Fred T. Isquith, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Reed R. Kathrein, Jeffrey W. Lawrence, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Francisco, CA, Betsy C. Manifold, Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, Gregory M. Nespole, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Darren J. Robbins, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Diego, CA, Christopher Paul Seefer, San Francisco, CA, Evan J. Smith, Brodsky & Smith LLC, Bala Cynwyd, PA, Marc A. Topaz, Schiffrin & Barroway, Bala Cynwyd, PA, for plaintiffs.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

WILKEN, District Judge.

Defendants U.S. Aggregates, Inc. (U.S. Aggregates or Company), its former Chief Executive Officer James Harris and its former Chief Financial Officer Michael Stone move to dismiss lead Plaintiff Eugene L. Loper's complaint alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934. Plaintiff opposes the motion. The matter was heard on August 9, 2002. Having considered all of the papers filed by the parties, and oral argument on the motion, the Court grants Defendants' motion to dismiss, and grants leave to amend (Docket # 49).

## BACKGROUND

The following facts are taken from Plaintiff's Consolidated Class Action Complaint filed on October 12, 2001 and as-

sumed to be true for purposes of this motion. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir.1999).

U.S. Aggregates is a producer of aggregates, i.e. crushed stone, sand and gravel. The Company's products are used primarily for the construction and maintenance of highways and other infrastructure projects and for residential construction. U.S. Aggregates operates through two wholly owned subsidiaries, SRM Holdings Corp. (SRMH) and Western Aggregates Holding Corp. (WAHC). WAHC, in turn, holds two additional subsidiaries, Monroc and Valley Asphalt.

■ Between 1994 and 1998, U.S. Aggregates completed twenty-eight business and asset acquisitions. The Company pursued this growth by acquisition strategy in order to place itself in a position to benefit from the Transportation Equity Act for the 21st Century (TEA–21), a federal program that promised a significant infusion of federal funding into highway construction and maintenance projects. U.S. Aggregates' acquisition strategy resulted in a rapid increase in its total assets, from $54 million at the end of 1994 to $374 million in June, 1999. It also resulted in a commensurate increase in debt, from $22.3 million to $225 million over the same time period. The Company's debt was financed, principally, by a credit agreement with Bank of America (BofA Credit Agreement) and a separate Warrant Purchase Agreement with Prudential Insurance Company of America (Prudential Agreement), collectively referred to throughout this Order as the Loan Agreements. The Loan Agreements included covenants that required U.S. Aggregates to maintain certain financial ratios. Plaintiff alleges that noncompliance with the financial ratio covenants constituted an event of default and could result in the loans becoming immediately due and payable. In August, 1999, U.S. Aggregates completed an IPO which raised approximately $68 million. This infusion of capital was used to pay down the Company's debt from $225 million to $157 million. By January, 2000, however, the Company's debt had once again increased to more than $200 million. Plaintiff alleges that in order to avoid violating the financial covenants in the Loan Agreements, U.S. Aggregates engaged in various forms of accounting fraud that falsely overstated its earnings for the first three quarters of calendar year 2000.[1]

The details of Plaintiff's allegations of fraud are provided by ten confidential witnesses (CW). Six of these confidential witnesses are former employees of Monroc. They include individuals who formerly held the positions of Chief Operating Officer (CW 1), controller (CW 10), assistant controller (CW 5), credit manager (CW 7), assistant credit manager (CW 8), and Vice President of Sales (CW 9) for Monroc. Three of the confidential witnesses are former employees of Valley Asphalt. These witnesses formerly held the positions of controller (CW 2) and assistant controller (CW 3 and CW 4) for Valley Asphalt. The final confidential witness is

1. The class period for this action began on April 25, 2000, with the publication of the first allegedly materially inflated financial report. Defendants move to strike all allegations in the Complaint that precede the class period on the grounds that such allegations are "impertinent and immaterial". Fed. R.Civ.P. 12(f). The allegations detailing Defendants' pre-class period conduct are material to Plaintiff's contention that Defendants' knew the statements made during the class period were false. U.S. Aggregates' growth strategy, its use of large amounts of debt in its capital structure and the potential consequences of failing to abide by the covenants in the Loan Agreements are material to Defendants' motive to make the allegedly false representations during the class period. Defendants' motion to strike all pre-class period allegations is denied.

the former Director of Finance for Western Aggregates (CW 6).

In the complaint, the confidential witnesses describe five areas where U.S. Aggregates' subsidiaries provided false information in their monthly financial reports in order to inflate earnings and maintain compliance with the debt/earnings ratios in the Loan Agreement covenants. First, CW 1, CW 5, CW 7 and CW 8 contend that Monroc regularly overbilled customers by sending invoices to customers for amounts greater than the agreed upon price and recorded the overbilled amount as revenue even though Monroc did not believe these billed amounts to be collectible. Second, CW 5, CW 7, and CW 8 state that up to $1 million in uncollectible accounts receivable remained on the books during the class period because the CFO of WAHC, Bart Smith, refused to write them off.

Third, in August or September, 2000, Monroc received $189,000 from a railroad as payment for a right-of-way. CW 1, CW 5, and CW 7 state that this payment was improperly recorded as payment on an unrelated customer's account receivable. The CWs allege that CFO Smith ordered the improper accounting. CW 7 states that he sent a letter to Defendant Stone informing him of this improper accounting, but received no reply.

Fourth, CW 2 alleges that U.S. Aggregates reported an inflated percentage of completion revenues by falsely reporting that particular construction projects were closer to completion than they actually were.

Fifth, CW 1, CW 4, and CW 5 contend that Monroc improperly capitalized labor costs and routine maintenance to quarry development in order to reduce expenses and increase margins, earnings and capital.[2]

The improper capitalization of costs and the improper recognition of revenues detailed by the confidential witnesses violated various Generally Accepted Accounting Principles (GAAP). CW 7, CW 4, and CW 5 all state that the reason the subsidiaries improperly recognized revenue and improperly capitalized costs was so that the Company could maintain compliance with the loan covenants.

For example, one of the loan covenants required the Company to maintain a specific "leverage ratio." The leverage ratio is the amount of debt divided by earnings before extraordinary items, minority interests, taxes interest, depreciation, depletion, and amortization expenses (EBITA). For the first two quarters of 2000, the leverage ratio required by the Loan Agreements was four to one. U.S. Aggregates reported a leverage ratio of 3.8 to one for those two quarters. Plaintiffs allege that if U.S. Aggregates' revenues and expenses had been reported accurately, the leverage ratio would have exceeded that required by the loan covenants for both quarters. On the day before the end of the third quarter of 2000, Defendant Stone negotiated a loosening of the leverage ratio to 4.25 to one. U.S. Aggregates reported a leverage ratio of 4.2 to one for that quarter. Plaintiffs allege that the actual ratio was 5.8 to one and the improper accounting measures detailed by the CWs permitted Defendants

---

**2.** Defendants move to strike all of the allegations attributed to the confidential witnesses as "immaterial, impertinent and scandalous." Fed.R.Civ.P. 12(f). Defendants contend that the CW allegations are unreliable for a variety of reasons and, moreover, fail to link Defendants to the allegedly wrongful conduct. Although the allegations of the CWs may not be

sufficient to satisfy the heightened pleading standard of the PSLRA, it cannot be said that they "do not pertain … to the issues in question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993). Defendants motion to strike the allegations attributed to the confidential witnesses is denied.

to report inaccurate numbers which hid the fact that the Company was not in compliance with the Loan Agreements.

In its press releases, SEC Form 10–Qs and in conversations with analysts that were subsequently relayed to the market, Defendants did not reveal any of these alleged financial improprieties. On April 24, 2000, U.S. Aggregates issued a press release summarizing its first quarter results. On April 25, Defendants participated in a conference call with capital market analysts wherein they discussed U.S. Aggregates' first quarter results. On May 9, 2000, U.S. Aggregates filed a Form 10–Q for the quarter ending March 31, 2000.

The press release and Form 10–Q stated that U.S. Aggregates net loss for that quarter was $2.6 million. The Form 10–Q also stated that the financial statements contained therein were prepared in accordance with GAAP. Plaintiff contends that these statements were false and misleading because the Company's actual net loss for the first quarter of 2000 was $5.1 million and the financial statements were not prepared in accordance with GAAP. Similarly, Plaintiff contends that the information provided to analysts was false and misleading because Defendants gave false earnings results and did not disclose the accounting improprieties detailed above.

Defendants made similar disclosures describing the Company's second and third quarter results. Plaintiff allege that these press releases and Form 10–Q disclosures were also false and misleading for the reasons already discussed. Namely, Defendants overstated earnings, understated costs, and violated GAAP in their financial statements.

On February 26, 2001, Defendant Stone was terminated as CFO after the Company's auditors raised concerns about the financial and accounting procedures for the Company's western operations. Stone's termination was not publicly disclosed until April 18, 2001.

On April 3, 2001, U.S. Aggregates restated its earnings for the first three quarters of 2000. Previously reported net income of $9.7 million was restated as a $300,000 net loss. Earnings per share (EPS) for all three quarters was also restated. Simultaneously, the Company announced that it was in default of the Loan Agreements, that its senior secured lenders had waived all defaults under the credit facility through April 13, 2001, and that the Company was discussing with its lenders and subordinated debt holder a longer term solution.

On April 18, 2001, the Company announced the results of those negotiations. The lenders agreed to waive defaults in exchange for increases in interest rates and fees. U.S. Aggregates' lenders also required the Company to hire a Chief Restructuring Officer by May 31, 2001. On May 11, 2001, Defendant Harris was replaced by Stanford Springel, an individual with experience in crisis management and financial turnarounds.

After the restatement of earnings, U.S. Aggregates entered into a loan agreement with its largest shareholder and also attempted to sell its assets in Northern Utah.

In short, Plaintiff alleges that the restatement of the Company's earnings and the consequent default on the Loan Agreements required U.S. Aggregates to 1) restructure its existing debt; 2) take on new debt; 3) change its management team; and 4) sell a large portion of its assets. Despite these actions, U.S. Aggregates' financial results have continued to decline since the end of the class period.[3] U.S.

---

**3.** Pursuant to Federal Rule of Civil Procedure 12(f), Defendants move to strike all allega-

tions concerning any conduct that took place after the end of the class period. However,

Aggregates filed for bankruptcy protection on March 11, 2002.[4]

## LEGAL STANDARD

### A. Rule 12(b)(6)

██ A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of facts which would entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Fidelity Fin. Corp. v. Fed. Home Loan Bank of San Francisco*, 792 F.2d 1432, 1435 (9th Cir.1986). Dismissal of a complaint can be based on either the lack of a cognizable legal theory or the lack of sufficient facts alleged under a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988).

All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986). However, "conclusory allegations without more are insufficient to defeat a motion to dismiss." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir.1988).

Although generally a court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion, material which has been properly submitted as part of the complaint may be considered. *See Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir.1997); *see also Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987). Moreover, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which

are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994). A court may also consider documents which are not expressly incorporated into the complaint, but "upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998).

When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. *See Cook, Perkiss & Liehe, Inc. v. Northern Cal. Coll. Serv. Inc.*, 911 F.2d 242, 246–47 (9th Cir.1990). In determining whether amendment would be futile, a court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir.1990). Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading. *See id.* at 296–97.

### B. Pleading Requirements

In 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub.L. No. 104–67, which amends the Securities Exchange Act of 1934. Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any secu-

---

post-class period conduct may provide support for Plaintiff's contention that compliance with the loan agreements motivated Defendants' fraud. "Any information that sheds light on whether class period statements were false or materially misleading is relevant." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63,

72 (2d Cir.2001). Defendants' motion to strike is, therefore, denied.

4. Because U.S. Aggregates has filed for bankruptcy, Plaintiff's suit against the Company is subject to the automatic stay provisions of the Bankruptcy Code. The action, however, may proceed against Defendants Harris and Stone.

rity ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b–5 (Rule 10b–5). To state a claim under § 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) reliance, (3) scienter, and (4) resulting damages." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d at 1151, 1157 (9th Cir.1996); *see also McCormick v. Fund Am. Cos.*, 26 F.3d 869, 875 (9th Cir.1994).

Plaintiffs must plead securities fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1543 (9th Cir.1994) (en banc) (*Glen-Fed I*). Further, although Rule 9(b) does not require that scienter be plead with particularity, *see Concha v. London*, 62 F.3d 1493, 1503 (9th Cir.1995), the PSLRA does. *See* 15 U.S.C. § 78u–4(b)(2).

### 1. Circumstances Constituting Fraud

Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985). The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading; and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

Except with respect to allegations made on information and belief, the PSLRA

pleading standard for allegations about the circumstances constituting fraud is the same as the Ninth Circuit's pre-PSLRA standard. Before the enactment of the PSLRA, plaintiffs already were required to plead specifically the time, place and nature of the alleged misrepresentations, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987), and to explain why each alleged misstatement or omission was false or misleading when made, *see GlenFed I*, 42 F.3d at 1549.

The PSLRA's requirement regarding allegations plead on information and belief is somewhat stricter than the Ninth Circuit's pre-PSLRA standard. For allegations made on information and belief, pre-PSLRA case law in the Ninth Circuit required "a statement of the facts upon which the belief is founded," *see Wool*, 818 F.2d at 1439, but did not expressly require that plaintiffs specifically plead *all* facts upon which the belief was based. The PSLRA, however, requires exactly that. *See* 15 U.S.C. § 78u–4(b)(1).

### 2. Scienter

The PSLRA provides that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Because the instant action alleges violations of § 10(b), the "required state of mind" is defined by § 10(b). *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir.1999).

Ninth Circuit case law prior to *Silicon Graphics* made clear that some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action. *See Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir.1978). Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as

a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)). As explained by the *Silicon Graphics* court, recklessness, as defined by *Hollinger,* is a form of intentional conduct, not merely an extreme form of negligence. *See* 183 F.3d at 976–77. Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[ ] some degree of intentional or conscious misconduct." *See id.* at 977. The *Silicon Graphics* court refers to this subspecies of recklessness as "deliberate recklessness." *See id.* at 977.[5]

The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. *See* 15 U.S.C. § 78u–4(b)(2); *Silicon Graphics,* 183 F.3d at 977. Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. *See* 183 F.3d at 979. In order to satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must

state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.*

## DISCUSSION

Plaintiff contends that a "strong inference" of deliberate recklessness can be drawn from the following allegations. First, Plaintiff has alleged a motive to falsify earnings in order to comply with the loan covenants. Second, Plaintiff relies on the confidential witness testimony to suggest that Defendants acted in accordance with this motive by knowingly providing false financial reports. Third, the repeated GAAP violations support an inference of scienter. Fourth, Plaintiff contends that the nature and magnitude of the restatement of earnings suggests that Defendants knew the Company was reporting inflated financial results. Fifth, Stone's termination as a result of the incorrect financial statements shows that he knew those results to be false. Sixth, Defendants' leadership positions in the Company and their "hands on" management style indicate that they had knowledge of the accounting improprieties.

### A. Motive

■ Plaintiff contends that Defendants reported inflated financial results knowingly or with deliberate recklessness in order to comply with the Loan Agreements, which contained covenants mandating maximum debt to earnings ratios. The

---

5. At least one district court in this circuit has concluded that the "deliberate recklessness" standard is a more stringent standard than the one set forth in *Hollinger. See In re Southern Pacific Funding Corp. Sec. Litig.,* 83 F.Supp.2d 1172, 1177 (D.Or.1999). Although it recognized that "[t]here is language in [*Silicon Graphics*] that suggests that it is merely restating the standard set forth in *Hollinger,*" the *Southern Pacific* court concluded that *Silicon Graphics* "raised the substantive standard applicable to § 10(b) claims." *See id.*

Read in that manner, *Silicon Graphics* overturns *Hollinger.* Because *Hollinger* was an en banc decision, while *Silicon Graphics* was not, this reading cannot be correct. *See United States v. Aguilar,* 883 F.2d 662, 690 n. 25 (9th Cir.1989) ("a panel not sitting en banc has no authority to overturn Ninth Circuit precedent"). This Court therefore concludes that the "deliberate recklessness" standard in *Silicon Graphics* is the same as the standard discussed in *Hollinger.*

Complaint describes how the Company's growth strategy was dependant on debt financing. Plaintiff accurately identifies the financial ratios the Company was required to maintain pursuant to the Loan Agreements and alleges that the failure to maintain these ratios was an event of default under the Agreements. Plaintiff provides strong circumstantial evidence that maintaining compliance with the financial ratios was critical to the Company. In particular, Plaintiff points out that U.S. Aggregates used all of its IPO proceeds, $68 million, to pay down its debt. Plaintiff also identifies four former employees of a subsidiary of the Company who assert that maintaining compliance with the financial ratios motivated the improper accounting practices. Finally, Plaintiff describes the consequences for the Company when its non-compliance with those covenants became public. Namely, the Company was forced to replace its CEO, restructure its debt, and sell much of its assets due to a liquidity crisis.

Defendants argue that this alleged motivation fails as a matter of law because maintaining compliance with the Loan Agreements is too generic a motive to create an inference of scienter. In support of this proposition, they rely on *Crystal Brands Sec. Litig.*, 862 F.Supp. 745, 749 (D.Conn.1994). In *Crystal Brands*, the plaintiff alleged that the defendant concealed its declining financial fortunes in order to forestall a default on loans, among other reasons. The court held that this allegation was too general to establish fraud with particularity as required by the PSLRA and Rule 9. "The basic flaw in plaintiffs' allegations of motive is that they do not specifically relate to defendants. Instead, they pertain to virtually any company that manufactures and distributes goods. It is inconceivable that a manufacturer, such as Crystal Brands, would not desire to maintain good relations with suppliers, retailers and lenders." *Id.* at 749.

In *Howard v. Everex Sys., Inc.*, however, the Ninth Circuit recognized that a desire "not to violate loan covenants with [the defendant's] principal lender" supported a finding of liability against the defendant. 228 F.3d 1057, 1064 (9th Cir. 2000). Defendants note that *Howard* was decided on JMOL, not on a motion to dismiss and suggest that the difference in legal standards applied to the two motions renders *Howard* inapposite. However, "the PSLRA did not alter the substantive requirements for scienter under § 10(b)." *Id.* If a desire to comply with loan agreements supports a finding that the defendant acted with the requisite scienter, than the allegation of such, if supported with sufficient particularity, must provide some support for reaching an inference of scienter. To apply a pleading standard that is more stringent than the substantive requirements is untenable.

Defendants also contend that the facts as alleged negate any inference that they were motivated by a desire to maintain compliance with the Loan Agreements. Specifically, Defendants note that U.S. Aggregates' lenders did not accelerate their loans upon learning of the Company's failure to comply with the covenants. In fact, the lenders restructured the loans and loosened the financial covenants. Plaintiff emphasizes that although the loans were not accelerated, the lenders did impose onerous restructuring requirements on the Company which led to a severe liquidity crisis and a firesale of U.S. Aggregates' assets.

Regardless of the actual consequences of the Company's non-compliance, Plaintiff has specifically alleged that improper accounting was motivated, in fact, by the financial ratios in the loan agreements. The confidential witnesses who allege such motivation held the positions of Chief Operating Officer, controller, assistant con-

troller, and credit manager for one of the Company's subsidiaries. These allegations are sufficiently concrete, particular and corroborated to raise an inference that the Loan Agreements could have motivated Defendants to disseminate the allegedly false financial data. For example, CW 7 alleges that he was hired in 1999 to work on accounts receivables for Monroc. He alleges that during the class period there was $1 million in accounts receivables that he recommended be written off. He contends that WAHC CFO Smith overruled his decision to write off the worthless accounts receivables. He alleges that the reason these accounts were not written off was to maintain compliance with the loan covenants. CW 5 also states that U.S. Aggregates desire to maintain compliance with the loan covenants motivated the improper accounting.

Defendants also contend that any inference that they had sufficient motive to commit fraud is negated by the fact that neither of the named Defendants is alleged to have made any insider trades during the class period. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir.2002) (CEO's sale of only 13% of his stock during the class period "tends to negate" an inference of scienter). However, there is no requirement that a plaintiff allege insider trading in order to satisfy the PSLRA pleading standard. In *Adaptive Broadband Sec. Litig.*, 2002 WL 989478 (N.D.Cal. April 2, 2002), the court found the direct evidence of fraud sufficient to defeat a motion to dismiss without any allegations of improper stock sales. *See also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir.2001) (lack of insider selling does not negate other allegations showing scienter).

In sum, Plaintiff's allegations of motive to commit fraud are sufficient. Plaintiff has alleged that Defendants undertook a specific business strategy that required a high ratio of debt financing. He has identified specific loan covenants that required specific financial ratios. He has alleged that absent the fraudulent conduct, U.S. Aggregates would have violated these loan covenants and been subject to the default provisions of the Agreements. Finally, he identifies confidential witnesses who contend that improper accounting methods were utilized to avoid violating the financial ratios in the Loan Agreements.

These allegations raise a strong inference that Defendants had a motive to engage in willful or deliberately reckless falsity. However, under the PSLRA and *Silicon Graphics*, motive is not sufficient to raise a strong inference of scienter. Plaintiff must come forward with particularized allegations "indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979.

### B. The Restatement and GAAP Violations

■ Plaintiff rely on the "nature, duration and magnitude" of the restatement as well as "numerous and repeated GAAP" violations to support an inference that Defendants acted with the requisite scienter.

As a general rule, failure to follow GAAP is not sufficient to raise an inference of scienter. In *DSAM Global Value Fund v. Altris Software*, for example, the plaintiff alleged that the defendant's auditor "egregiously failed to see the obvious" GAAP violations in the financial statements. 288 F.3d 385, 387 (9th Cir.2002). As is the case here, the defendant later admitted that the audited financial statements did not comply with GAAP. *Id.* at 390. The plaintiff in *DSAM* alleged specific "red flags" that should have put the defendant on notice of the GAAP violations. In particular, the fees for the transaction at issue were exorbitant, the trans-

action was recorded on the last day of the year, and the transaction was described as "special." These facts all suggested that the auditor should have undertaken further investigation before approving the transaction. *Id.* at 389. Despite the admitted failure to comply with GAAP and the undisputedly suspicious nature of the transaction, the court held that "the allegations of negligence are insufficient to establish a strong inference of deliberate recklessness." *Id.* at 391. Pursuant to *DASM*, even an obvious failure to follow GAAP does not give rise to an inference of scienter.

> Appellants have failed to allege any facts to establish that [the defendant] knew or must have been aware of the improper revenue recognition, intentionally or knowingly falsified the financial statements, or that the audit was such an extreme departure from reasonable accounting practice that [the defendant] knew or had to have known that its conclusions would mislead investors.

*Id.* at 390–91 (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426–27 (9th Cir.1994)).

Plaintiff's complaint suffers from the same deficiency identified by the court in *DSAM*. Plaintiff has alleged multiple violations of GAAP. However, he has made no particularized allegations that would suggest Defendants knew or must have known of these errors, or that the errors were "such an extreme departure" from the norm that Defendant Stone, simply by reading the financial statements, would have known of the errors. The allegation that Defendant Harris's statements were made with the requisite scienter is more attenuated because Harris is not alleged to have played any direct role in drafting or reviewing U.S. Aggregates' financial statements.

Plaintiff does allege that the magnitude of the GAAP errors, as recognized by the restatement, raises an inference of scienter. However, the cases Plaintiff relies on for this contention all involved restatements of significantly larger amounts than what is alleged here. In addition, these cases found an inference of scienter not only from the magnitude of the restatement but also from additional, specific allegations that the defendants had actual knowledge of relevant facts from which scienter could be inferred. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273–74 (N.D.Cal.2000); *Adaptive Broadband*, 2002 WL 989478 at *13. Furthermore, the allegations in Plaintiff's complaint suggest that the GAAP violations with which Plaintiff takes issue were not solely responsible for the magnitude of the restatement. In fact, Plaintiff alleges that the largest change in earnings revealed by the restatement was the result of a change in the accounting treatment of shipping and handling charges. *See* Complaint ¶¶ 72(a) & (b), 81(a) & (b), 99(a) & (b). Plaintiff does not allege that the restatement of shipping and handling charges was the result of fraud. Consequently, the GAAP violations alleged by Plaintiff and the restatement of earnings that resulted, in part, because of these alleged GAAP violations do not raise a strong inference of scienter because there are no particularized allegations suggesting Defendants knew of these violations.

### C. Stone's Termination

■ There is no factual basis from which to infer that Defendant Stone was terminated in February, 2001 because he knowingly or with deliberate recklessness made materially false statements during the class period. Plaintiff relies on an April 18, 2001 press release from the Company which states,

> As a result of issues raised regarding certain financial and accounting matters affecting the Company's western opera-

tions and the recommendation of the Company's auditors, the Company's Board of Directors authorized the audit committee to expand the scope of the year-end audit and to increase its oversight of the audit. As part of this process, the Company restated the results of its first three quarters of 2000, and certain members of management resigned, were put on administrative leave, or were terminated.[6]

Complaint ¶ 115. One could infer from this press release that Defendant Stone's termination was related to the restatement. However, after a restatement of earnings and a subsequent loan default, it is unremarkable that the Company would seek to change its management team. Plaintiff can point to no particularized allegation refuting the reasonable assumption that Defendant Stone was fired simply because the errors that lead to the restatement occurred on his watch or because he failed adequately to supervise his department. Any inference beyond that is unwarranted without more specific allegations.

### D. Harris and Stone's Position in the Company

Plaintiff has alleged that Defendant Harris was the CEO of U.S. Aggregates and Defendant Stone was the CFO during the class period. As CEO and CFO, Harris and Stone were responsible for managing the Company and reporting the Company's financial results. Plaintiff has also alleged that Defendant Stone, in particular, was "very hands on" and "left no stone unturned." Complaint ¶ 46. Defendant Stone, moreover, signed each of U.S. Aggregates' loan agreements and the SEC filings which Plaintiff alleges to be false.

These allegations fail to raise an inference of scienter under the PSLRA. "Defendants are correct in their argument that plaintiffs must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands on' positions, because that would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 844 (N.D.Cal.2000).

### E. Confidential Witness Testimony

 Last, Plaintiff relies on the testimony of ten confidential witnesses to raise an inference that the allegedly false and misleading statements were made with deliberate recklessness. The confidential witness testimony, however, lacks the particularity necessary to raise a strong inference of wrongdoing.

For example, many of the allegations are not linked to the GAAP violations and, therefore, are not probative of the falsity of the press releases and Form 10–Q disclosures. *See e.g.* ¶¶ 48 (overbilling among subsidiaries); 50 (miscategorization of money received as payment for a right-of-way). Other allegations are too generalized and vague to imply anything about the Company's financial disclosures. *See e.g.* ¶¶ 55 (numbers were "manipulated" at Monroc and Western Aggregates); 67 (WAHC was a "dirty company" and WAHC CFO Smith "managed by intimidation").

In addition, none of the confidential witnesses have any first-hand knowledge of U.S. Aggregates' accounting decisions. The Complaint alleges that the subsidiaries for whom the CWs worked sent month-

---

**6.** The parties do not dispute that Defendant Stone was terminated from his position as CFO in February, 2001.

ly financial reports to U.S. Aggregates where they were consolidated by Defendant Stone. Complaint ¶ 46. None of the CWs have alleged any particularized facts that indicate they knew the basis of Stone's accounting decisions. None had discussions with Stone and none were instructed by Stone to undertake any particular actions.[7] In lieu of this type of particularized allegation, which is required by the PSLRA, Plaintiff relies on vague assertions of Stone's authority, *see* ¶ 46, and hearsay assertions of Stone's scienter, *see id.* ("CW 1 stated that Western Aggregates CFO Smith told CW 5 and CW 6 that defendant Stone wanted accounting entries done in a particular way and if CW5 and CW6 did not do it Stone's way, they would be fired."). These allegations are not sufficient to raise a strong inference of deliberately reckless conduct because they show neither knowledge nor participation by Defendants in the alleged accounting improprieties.

Plaintiff contends that the CWs need not have had personal contact with Defendants because they became aware of the accounting improprieties as a result of their jobs. Plaintiff is correct that the precise amount of detail that must be revealed about a confidential witness depends on the circumstances. *See In re Secure Computing Corp.*, 184 F.Supp.2d 980, 988 (N.D.Cal. 2001). "To contribute meaningfully toward a strong inference of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *In re Northpoint Communi-*

*cations Group,* 221 F.Supp.2d 1090, 1099–1100 (N.D.Cal.2002).

Importantly, the GAAP violations alleged by Plaintiff would not be obvious simply from a review of the financial reports. For example, Plaintiff alleges that U.S. Aggregates' subsidiaries regularly overbilled customers and charged the uncollectible overbilled amounts as revenue. Unless Defendant Stone was aware of the practice of overbilling, he would not know from a review of the financial statements that the revenue projections were inflated. Similarly, Plaintiff alleges that U.S. Aggregates improperly capitalized expenditures (such as pond sand) as assets. Again, if Defendant Stone was not specifically aware of this fraudulent allocation, he would not be deliberately reckless if he failed to recognize it solely from a review of the financial statements. Consequently, in order to raise a strong inference of deliberate recklessness, Plaintiff must plead facts that show Defendants Stone and Harris had reason to know about the accounting improprieties identified by the confidential witnesses.

In this case, the only particularized allegation that anyone had knowledge of the alleged accounting improprieties is made by CW 7. CW 7 contends that Western Aggregates CFO Smith directed him not to write off worthless receivables and to miscategorize a payment as a receivable. Complaint ¶¶ 49–50. But Smith is not alleged to have made any false and misleading statements and is not a Defendant in this action. The assumption that Stone and Harris acted with deliberate reckless-

---

7. CW 7 contends that he wrote a letter to Defendant Stone complaining of a specific incident of improper accounting. There is no indication whether Defendant Stone received and reviewed the letter, whether the single incident of improper revenue recognition identified in the letter was rectified prior to the submission of consolidated financials for the Company, or whether this incident was later rectified during the audit that led to the restatement of earnings. This single allegation that Defendant Stone had knowledge of a single improper revenue recognition decision fails to state sufficient facts from which a strong inference of scienter can be drawn.

ness with respect to these transactions requires an impermissible inferential leap.

Consequently, the Complaint fails to allege sufficient particularized facts from which a strong inference of deliberate recklessness can be drawn. Because Plaintiff has failed to allege an underlying primary violation, its claim for "control person" liability under section 20(a) must also be dismissed. *In re Worlds of Wonder Sec. Litig.*, 814 F.Supp. 850, 872 (N.D.Cal.1993) ("[T]here being no primary violation, there can be no secondary violation.").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted (Docket # 49). Plaintiff is granted leave to amend his complaint, if he is able, to state additional particularized facts from which a strong inference of deliberate recklessness may be drawn. Plaintiff shall file his amended complaint within twenty days of the date of this order. If no amended complaint is filed, this case shall be dismissed. If an amended complaint is filed, Defendants shall answer timely or notice a motion to dismiss for November 1, 2002 at 10:00 a.m. A case management conference shall be held at that time whether or not a motion to dismiss is filed.

Defendants' motion to strike is denied (Docket # 51).