State of NORTH DAKOTA,
et al., Plaintiffs,

and

State of South Dakota, and State
of Nebraska, et al., Plain-
tiffs/Intervenors,

v.

The UNITED STATES ARMY CORPS
OF ENGINEERS, et. al.,
Defendants.

No. A1–03–050.

United States District Court,
D. North Dakota,
Southwestern Division.

July 14, 2003.

Dean J. Haas, Lyle Gregory Witham, Attorney General's Office, Civil Litigation, Bismarck, ND, for plaintiffs.

Daniel W. Pinkston, U.S. Department of Justice, Environmental Defense Section, Denver, CO, Cameron W. Hayden, U.S. Attorney's Office, Bismarck, ND, Fred R. Disheroon, U.S. Department of Justice, Environment and Natural Resources, Washington, DC, for defendants.

Daniel H. Israel, Boulder, CO, for amicus.

Clark Jay Bormann, Bormann Law Office, Bismarck, ND, David D. Cookson, Nebraska Atty Gen's Office, Lincoln, NE, John P. Guhin, Attorney General's Office, Pierre, SD, for intervenor.

## MEMORANDUM AND ORDER DENYING NORTH DAKOTA'S MOTION FOR A PRELIMINARY INJUNCTION

HOVLAND, Chief Judge.

### I. *PROCEDURAL HISTORY*

This case arises out of the management and operation of the Missouri River and its attendant reservoirs. The matter before the Court is the State of North Dakota's Motion for a Preliminary Injunction. North Dakota seeks a preliminary injunction order stating:

> that the Corps maintain a minimum cold water habitat in Lake Sakakawea of 200,000 acre-feet through September 30, 2003. The particular way to achieve the

minimum 200,000 acre-feet should be left, however, to the Corps' management and discretion.

> That a Special Master be appointed by the Court to monitor compliance with the order throughout the summer, and to make recommendations to the Court to address any changes or adjustments that may be needed based on higher or lower flows than anticipated in the Corps' June 1, 2003 forecast, or to address any unanticipated downstream impacts.

On May 7, 2003, the Court extended an Ex Parte Temporary Restraining Order entered on April 29, 2003, by state district court Judge Gail Hagerty. On May 16, 2003, the Court again extended the Ex Parte Temporary Restraining Order until the end of May based on the consent of the Corps of Engineers, modified the Order to allow a maximum daily average release of 21,500 cfs from Garrison Dam, and suspended the requirement that the Corps of Engineers submit a compliance plan by May 19, 2003. On May 29, 2003, the Court granted the Corps of Engineers' Motion to Dissolve the Ex Part Temporary Restraining Order. On June 4, 2003, the Court held a hearing on both North Dakota's and South Dakota's Motions for Preliminary Injunctions, at which the parties submitted additional evidence and the Court heard testimony from several witnesses. The same day, June 4, 2003, the Eighth Circuit released its opinion in *South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir.2003).[1]

This matter comes before the Court with a complex and lengthy history involving the dispute between the Corps of Engi-

---

1. The Eighth Circuit combined several appeals involving the Missouri River and issued one opinion resolving the following cases: *State of South Dakota, et al. v. Ubbelohde, et al.,* No. 01–2133SD; *State of South Dakota, et al. v. Ubbelohde,* No. 02–2144SD; *State of*

*South Dakota, et al. v. Ubbelohde, et al.,* No. 02–2185SD; *State of South Dakota, et al. v. Ubbelohde, et al.,* No. 02–2187SD; *State of Nebraska, et al. v. Ubbelohde, et al.,* No. 02–2191NE; *State of North Dakota, et al. v. Ubbelohde, et al.,* No. 02–2305ND.

neers and the various Missouri River Basin states regarding the management of the Missouri River. A more extensive review of the background of the case is set forth in the Court's Orders of May 16, 2003, and May 29, 2003. However, a brief summary is necessary to provide the backdrop to North Dakota's Motion for a Preliminary Injunction.[2]

## II. BACKGROUND

On February 20, 2003, the North Dakota Department of Health issued a "Notice of Violation" to the Corps of Engineers alleging continuing violations and actions that threatened to violate North Dakota's water quality standards applicable to Garrison Dam and Lake Sakakawea. The Notice of Violation indicated that the North Dakota Department of Health may file suit against the Corps of Engineers. In essence, the Notice of Violation asserted that the Corps' management of Lake Sakakawea constitutes a form of "pollution" under state law which would threaten the lake's cold water fishery by decreasing the lake's water elevation.

The State of North Dakota filed a complaint in state district court on April 29, 2003. In its complaint, the State alleged that the Corps of Engineers violated North Dakota's water quality standards in Lake Sakakawea through its operation of the Garrison Dam. It is alleged in the complaint, and the state district court found in its TRO, that Section 313(a) of the federal Clean Water Act constitutes a waiver of sovereign immunity, thus allowing states to sue federal entities for alleged violations of state water quality

standards. See 33 U.S.C. § 1323(a). In essence, the State of North Dakota alleges that the Corps management of water levels in Lake Sakakawea during the summer months will violate North Dakota's water quality standards as it relates to the maintenance of a cold water fishery in Lake Sakakawea.

The State of North Dakota contends that the Corps of Engineers' management of the Missouri River Mainstem Reservoir System, and particularly the management of the release of waters from Garrison Dam, constitutes a form of "pollution" because it is a "man-made or man-induced" change that has altered the physical, chemical, and biological integrity of Lake Sakakawea. According to the State, adherence to the Corps of Engineers' April 1, 2003, and May 1, 2003, projected forecast and its current Annual Operating Plan will result in no cold water fish habitat remaining in Lake Sakakawea by the end of the summer of 2003. However, based on the June 1, 2003, forecast, approximately 173,340 acre-feet of cold water habitat would remain at the end of September 2003. *It is undisputed that at the present time, no specific violations of North Dakota law or of water quality regulations have occurred.*[3]

The State of North Dakota is seeking injunctive relief to (1) maintain a minimum cold water habitat in Lake Sakakawea of 200,000 acre-feet through September 30, 2003; and (2) to appoint a Special Master to monitor compliance with the preliminary injunction throughout the summer. North Dakota contends that the survival of the cold water fishery in Lake Sakakawea

---

**2.** A Motion for Preliminary Injunction has also been made by South Dakota, and it will be the subject of a separate order.

**3.** Although the State of North Dakota characterizes the Corps' actions as constituting "apparent continuing violations," in its Notice of Violation the State uses language that refers

to future violations rather than current violations; for example "will likely cause," "likely to cause," and "will likely occur." At the June 4, 2003, hearing Mike Sauer of the North Dakota Department of Health conceded that the Corps was not currently violating North Dakota water quality standards.

this summer is dependent upon (1) the average elevation of Lake Sakakawea in May before it stratifies; and (2) the amount that inflow into the lake exceeds outflow during the months of June, July, and August. The first factor is now moot because the State's initial concern about maintaining the average elevation of Lake Sakakawea in May before it stratified has been addressed. Thus, the issue of whether to grant a preliminary injunction focuses on the amount of inflow and outflow at Lake Sakakawea for the remainder of the summer months.

Since the original filing in North Dakota state district court, the case was removed to federal district court, and the States of Nebraska and South Dakota have been allowed to intervene. To summarize the current litigation, North Dakota seeks injunctive relief that would limit releases from Garrison Dam throughout the summer of 2003. South Dakota wants the Court to order that water elevations in other mainstem reservoirs not be lowered in order to raise the elevation of Lake Sakakawea and specifically wants to prevent the lowering of water elevations in Lake Oahe. The State of Nebraska wants the Corps of Engineers to comply with the 2003 Annual Operating Plan forecast which means drawing down the water levels from the upper reservoirs throughout the summer to support the Endangered Species Act, navigation, and other downstream needs. The diverse interests of the states and their needs for adequate water levels in the Missouri River and its reservoirs come at a time when this region of the country is experiencing its fourth year of drought conditions.

## III. *LEGAL DISCUSSION*

■ In determining whether preliminary injunctive relief should issue, the Court is required to consider the factors set forth in *Dataphase Systems, Inc. v. C.L. Sys. Inc.*, 640 F.2d 109, 114 (8th Cir.

1981) (*en banc*). The Eighth Circuit summarized those factors as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. *Dataphase Systems, Inc. v. C.L. Sys, Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556 (8th Cir.1993) *cert. denied* 512 U.S. 1236, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994).

*Pottgen v. Missouri State High School Activities Association*, 40 F.3d 926, 929 (8th Cir.1994).

■ The burden of establishing the necessity of a preliminary injunction is on the movant. *Baker Electric Co-op. Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994); *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734, 737 (8th Cir.1989) (*en banc*). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Electric Co-op*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)). The granting of a preliminary injunction is an extraordinary remedy and the right to such relief must be clearly established by the movant. *Brookins v. Wissota Promoters Ass'n, Inc.*, 142 F.Supp.2d 1149, 1151 (D.N.D.2000). The Court will address each of the *Dataphase* factors.

## A. PROBABILITY OF SUCCESS ON THE MERITS

To succeed on the merits, North Dakota must clear several hurdles including issues pertaining to the availability of judicial review, sovereign immunity, and the application of water quality standards.

### 1. AVAILABILITY OF JUDICIAL REVIEW

In prior litigation between various Missouri River Basin states and the Corp of Engineers, the Corps has argued that federal district courts lacked jurisdiction to review management decisions of the Corps because these decision were "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). *See e.g.,* Brief of Appellant, p. 23, *State of North Dakota v. Ubbelohde,* No. 02–2305. This very issue was recently resolved by the Eighth Circuit Court of Appeals in the case of *South Dakota v. Ubbelohde,* 330 F.3d 1014 (8th Cir.2003), a decision issued on June 4, 2003.

In *South Dakota v. Ubbelohde,* the Eighth Circuit directly addressed the issue of whether the Corps of Engineers' actions are subject to judicial review. The Eighth Circuit rejected the Corps of Engineers' argument that its actions are not subject to judicial review and held that the Corps' actions are constrained both by the Flood Control Act of 1944 and the Master Manual. 330 F.3d 1014, 1027–1029. The Eighth Circuit concluded that courts could (1) review the Corps of Engineers' compliance with the Flood Control Act which mandates the Corps must consider the various interests (flood control, navigation, recreations, and other interests) before making a decision, and (2) review the Corps' compliance with the Master Manual which directs the operation of the Missouri River.

Here, the State of North Dakota's claim is based on a different theory and body of law than its previous claim, although the relief the State seeks appears to be nearly identical. North Dakota's current claim is based on the Corps' alleged violation of the federal Clean Water Act and North Dakota water quality standards rather than on the Corps' alleged violation of the Flood Control Act or the Master Manual. Thus, although it provides substantial guidance, the *South Dakota v. Ubbelohde* decision is not dispositive as to the issue of availability of judicial review.

■ The Ninth Circuit has held that "[u]nder the Clean Water Act, all federal agencies must comply with state water quality standards. . . . 33 U.S.C. § 1323(a). Judicial review of this requirement is available under the Administrative Procedure Act." *Oregon Natural Resources Council v. United States Forest Service,* 834 F.2d 842, 852 (9th Cir.1987); *see also National Wildlife Federation v. United States Army Corps of Engineers,* 132 F. Supp 2d 876, 878 (D.Or.2001) (finding that the court had jurisdiction to review claims that the Corps was "violating the Clean Water Act by not complying with the water quality standards of the State of Washington").[4]

---

**4.** The contrary conclusion was reached by a Pennsylvania district court when environmental groups sought to force the Corps to comply with the Water Resources Development Act of 1990, which set forth the general directive that "environmental protection [shall be included] as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects." *See Raymond Proffitt Foundation v. U.S. Army Corps of Engineers,* 175 F.Supp.2d 755, (E.D.Pa.2001) (holding that because "[t]he text of § 2316 provides only a general statement that established environmental protection as one of the Corps' primary missions [and] gives no guidance on how this mission is to be carried out . . . § 2316 falls under the § 701(a) exception for cases where 'agency action is committed to agency discretion by law' [and thus, is not capable of review by a court]").

Thus, it appears the Corps' compliance with the Clean Water Act is subject to judicial review.

## 2. *SOVEREIGN IMMUNITY*

The next hurdle the State of North Dakota must clear involves the Corps of Engineers' claim of sovereign immunity. North Dakota argues that Section 313 of the Clean Water Act [33 U.S.C. § 1323] constitutes a waiver of sovereign immunity. Section 313 of the Clean Water Act provides, as follows:

   (a) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges.

For additional support, North Dakota cites to *National Wildlife Federation v. United States Army Corps of Engineers*, 92 F.Supp.2d 1072, 1081 (D.Or.2000), where the court found that "[u]nder the Clean Water Act, all federal agencies must comply with state water quality standards" and to Executive Order 12088, 43 Fed.Reg. 27,707 (Oct. 12, 1978), where President Carter ordered executive agencies to comply with the Clean Water Act as well as other federal environmental standards.

North Dakota also refers the Court to the legislative history of Section 313 of the Clean Water Act. The Clean Water Act was amended in 1977 in response to an Eighth Circuit decision, *Minnesota v. Hoffman*, 543 F.2d 1198 (8th Cir.1976), *cert. denied*, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977), which held that the Corps of Engineers was exempt from Sections 313 and 404 of the Clean Water Act when conducting dredging activities. A portion of the Clean Water Act's legislative history states:

The act has been amended to indicate unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws. Though this was the intent of Congress in passing the 1972 Federal Water Pollution Control Act Amendments, the Supreme Court, encouraged by Federal agencies, has misconstrued the original intent.

Since the substantive requirements of the act and of State and local law would be unenforceable unless procedural provision were also met, section 313 is amended to specify that, as in the case of air pollution, a Federal facility is subject to any Federal, State, and local requirement respecting the control or abatement of water pollution, both substantive and procedural, to the same extent as any person is subject to these requirements. This includes, but is not limited to, requirements to obtain operating and construction permits, reporting and monitoring requirements, any provisions for injunctive relief and such sanctions imposed by a court to enforce such relief, and the payment of reasonable service charges....

The amendment to section 404 clarifies the intent of Congress relative to the dredging activities of the U.S. Army Corps of Engineers to maintain navigation on the Nation's waterways is in the national interest. However, Corps dredging activities, like any municipal or

industrial discharge to the Nation's waters, or any private dredging activities, should be conducted in compliance with applicable State water quality standards. The Corps, like other Federal agencies, should be bound by the same requirements as any other discharger into public waters.

By this amendment, the committee clarifies that Corps dredging activities are not exempt from State pollution abatement requirements. In spite of language in section 313 in the Senate report on the 1972 act, that "requires every Federal agency with control over any activity or real property, to provide national leadership in the control of water pollution in such operations", the Supreme Court ruling in the Minnesota case would otherwise free corps-conducted dredging from compliance with State water quality standards. The intention of the 1972 act was not to exempt the Corps or any other public or private agency from State water quality standards and the interpretation of section 404 by the courts is at variance with the intent of Congress. . . .

This amendment to section 404 is neither intended nor expected to result in compromising the ability of the Corps to maintain navigation. The States that have taken administrative and judicial action to seek Corps compliance with water quality standards have a comparable interest in the movement of commerce on waterways maintained by corps dredging. The committee expects that such States will act both to insure compliance with water quality standards and continued corps dredging activities. S.Rep. No. 95–370, at 68–69 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4393. North Dakota argues that Section 313 when read in conjunction with the 1977 amendments, shows that the Corps of Engineers must comply with state water quality standards. Finally, North Dakota

contends that the Corps should be able to operate the Missouri River Mainstem Reservoir System in a manner that complies with both the Clean Water Act and the Master Manual.

The Corps of Engineers argues that the waiver of sovereign immunity set forth in Section 313 is not a complete waiver and specifically points to Section 511 [33 U.S.C. § 1371] which provides as follows:

This chapter shall not be construed as

(1) limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter;

(2) *affecting or impairing the authority of the Secretary of the Army*

   (A) *to maintain navigation* or

   (B) under the Act of March 3, 1899 (30 Stat. 1122); except that any permit issued under section 1344 of this title shall be conclusive as to the effect on water quality of any discharge resulting from any activity subject to section 403 of this title, or

(3) affecting or impairing the provision of any treaty of the United States.

(emphasis added). The Corps of Engineers asserts that an injunction precluding necessary releases of water would not be sufficient to provide minimum service to navigation. The Corps also characterizes the current situation as the precise type of fact pattern that Section 511 was enacted to address. The Corps acknowledges that its obligation to "maintain navigation" does not always trump the Clean Water Act. However, the Corps contends that when it is faced with what it calls an "either-or-situation," the Corps ability to maintain navigation is not subject to state water quality standards.

The Corps of Engineers also contends that the Eighth Circuit decision in *State of Missouri ex rel. Ashcroft v. Dep't of the Army*, 672 F.2d 1297 (8th Cir.1982) bars North Dakota's claims. In the *Missouri* case, the plaintiffs argued that the Corps was discharging pollutants into the Sac River through its construction and operation of a dam and power generator, and that this constituted a violation of the Clean Water Act and Missouri state water quality laws. The Eighth Circuit held that the federal Clean Water Act "subjects the Corps of Engineers to state water quality laws only if it were causing 'the discharge or runoff of pollutants.'" *Id.* at 1304. Although the *Missouri* decision may be helpful to the Corps' other arguments, the decision did not touch on issues of sovereign immunity and does not bolster the Corps' sovereign immunity argument.

■ While there is no question that Section 313 of the Clean Water Act [33 U.S.C. § 1323] constitutes a partial waiver of sovereign immunity, there is also no question that Section 511 [33 U.S.C. § 1371] provides sovereign immunity protection for the Corps of Engineers when compliance with the Clean Water Act may "affect or impair" the authority of the Corps of Engineers to "maintain navigation." Thus, the issue becomes whether compliance with North Dakota's water quality standards would "affect or impair" the Corps of Engineers' ability to maintain navigation.[5] Even though the Corps has not specified how or why the relief North Dakota seeks would "affect or impair" the Corps' ability to "maintain navigation," the fact that the Corps of Engineers may be able to successfully argue it is immune from suit is a factor which weighs heavily against North

Dakota's probability of success on the merits. This finding is further supported by the recent pronouncement of the Eighth Circuit Court of Appeals in *South Dakota v. Ubbelohde.*

### 3. *WATER QUALITY STANDARDS*

North Dakota's complaint alleges that the Corps of Engineers Annual Operating Plan (AOP) for 2003 creates violations of North Dakota's water quality laws. North Dakota's ability to enact and enforce water quality standards is outlined by the Federal Water and Pollution Control Act.

The Federal Water and Pollution Control Act, commonly referred to as the Clean Water Act, 33 U.S.C. § 1251 *et. seq.* was designed to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). The Clean Water Act provides for two primary sets of water quality measures: effluent limitations, found in 33 U.S.C. § 1311, and water quality standards, found in 33 U.S.C. § 1313.

The effluent limitations section focuses on the control of individual discharges from "point sources" into the navigable waters. A "point source" is defined as "any discernable, confined, and discrete conveyance" such as a pipe, ditch, or conduit from which "pollutants" may be discharged in navigable waters. *See* 33 U.S.C. § 1362(14). The Clean Water Act provides that the discharge of any "pollutant" by any person shall be unlawful. The term "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage; garbage, sewage sludge, munitions, chemical wastes, biological ma-

---

**5.** The issue of sovereign immunity was not addressed in the Oregon case cited by North Dakota, and it is unclear whether the river system in question there was used for navigation. *National Wildlife Federation v. United*

*States Army Corps of Engineers,* 132 F.Supp.2d 876 (D.Or.2001); *National Wildlife Federation v. United States Army Corps of Engineers,* 92 F.Supp.2d 1072 (D.Or.2000).

terials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *See* 33 U.S.C. § 1362(6). The term "pollution" as opposed to "pollutant" has a broader definition under federal law and means the "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of the water." *See* 33 U.S.C. § 1362(19). The courts have determined that the release of water from dams does not equate with the addition of "pollutants" to navigable waters. *See National Wildlife Federation v. Gorsuch,* 693 F.2d 156 (D.C.Cir.1982); *Missouri ex rel. Ashcroft v. Dept. of the Army,* 672 F.2d 1297, 1303–1304 (8th Cir. 1982). However, few courts have tackled the issue of whether the operation of dams may create "pollution."

North Dakota has not alleged that the Corps of Engineers is discharging pollutants into the Missouri River in violation of Sections 301 [33 U.S.C. § 1311] and 402 [33 U.S.C. § 1342] of the Clean Water Act. In fact, North Dakota has specifically stated that its cause of action *does not* arise under the Clean Water Act's permitting system, which regulates the discharge of pollutants into navigable waters. *See* 33 U.S.C. §§ 1311, 1342. Although previous decisions regarding the Corps of Engineers activities as it relates to the discharge of pollutants may be somewhat analogous to North Dakota's claims, they do not resolve the question of whether the Corps of Engineers is subject to state water quality standards under Section 303 of the Clean Water Act which regulates pollution rather than the discharge of pollutants. *See e.g., State of Missouri ex rel. Ashcroft v. Dep't of the Army,* 672 F.2d 1297 (8th Cir.1982) (holding discharges from dams could not be classified as the runoff of a pollutant); *National Wildlife Federation v. Gorsuch,* 693 F.2d 156 (D.C.Cir.1982) (holding dam-induced water

quality changes do not constitute "discharge of a pollutant" under 33 U.S.C. § 1362(12)).

Under Section 303, the Clean Water Act directs each state to establish its own water quality standards subject to the procedures set forth in federal statutes and regulations. *See* 33 U.S.C. § 1313. State water quality standards must contain three elements, (1) designated uses, (2) numeric or narrative water quality criteria, and (3) antidegradation rules. 40 C.F.R. § 131.6(a), 136.11(a)(1), 131.11(b)(1) and (b)(2), 131.6(d), 131.12. There is no mechanism in the Clean Water Act for the enforcement of water quality standards adopted by the states; rather the enforcement is left to the states.

On March 27, 2003, North Dakota Governor John Hoeven signed an emergency bill amending North Dakota's water quality statute which enabled this action to be brought by the State. Section 61–28–06(1) of the North Dakota Century Code as amended states in relevant part as follows:

1. It shall be unlawful for any person:

   a. To cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state; and

   b. To discharge any wastes into any waters of the state *or to otherwise cause pollution* which reduces the quality of such waters below the water quality standards established therefor by the department.

The statute also provides that:

3. Notwithstanding any other provisions of this chapter, and except as in compliance with the provisions of this chapter, and any rules and regulations promulgated hereunder, the discharge of any wastes *or the viola-*

*tion of any water quality standards, by any person shall be unlawful. The department may seek injunctive relief for a threatened or continuing violation of a water quality standard, including any violations of the narrative standards, if the department determines that the violation will substantially interfere with or cause or threaten to cause long-term or irreparable harm to waters of this state that the department determines has statewide or regional significance or has a substantial impact to a local community. The authority to seek injunctive relief for a violation of the water quality standards, including violations of the narrative standards, is limited to the department, after obtaining written approval of the governor, and may not be enforced by any other person.*

N.D.C.C. § 61–28–06(3) (amending language underlined). "Person" is defined in the statute to include *"any state or federal agency or entity responsible for managing a state or federal facility."* N.D.C.C. § 61–28–02(5). "Pollution" is defined as "the manmade or man-induced alteration of the physical, chemical, biological, or radiological integrity of any waters of the state." N.D.C.C. § 61–28–02(7). This is virtually the same definition of "pollution" found in the federal Clean Water Act. North Dakota's regulatory schemes are also similar to the anti-pollution laws and regulations of each of the states that border the Missouri River.

A review of litigation involving the Corps of Engineers and its operations of dams reveals few situations where states have attempted to enforce their water quality standards, but at least one other federal district court has grappled with an alleged violation of state water quality standards by the Corps of Engineers.[6] In *National Wildlife Federation v. United States Army Corps of Engineers,* 132 F.Supp.2d 876, 878 (D.Or.2001), the Federal District Court for the District of Oregon found it had jurisdiction to review claims that the Corps of Engineers was "violating the Clean Water Act by not complying with the water quality standards of the State of Washington" and cited to a line of Ninth Circuit opinions to supports its conclusion. *Id.* at 889 (citing *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1153 (9th Cir.1998); *Oregon Natural Resources Council v. Lyng,* 882 F.2d 1417, 1424 (9th Cir.1989); *Oregon Natural Resources Council v. United States Forest Service,* 834 F.2d 842, 848 (9th Cir.1987)).

In *National Wildlife Federation,* various environmental groups from Oregon and Washington filed suit against the Corps of Engineers alleging that the actions of the Corps in operating four dams on the Lower Snake River violated the Clean Water Act. The Lower Snake River runs through the southeast corner of the State of Washington, and empties into the Columbia River near Kennewick, Washington. The Corps of Engineers owns and operates four power projects and dams— Ice Harbor, Lower Monumental, Little Goose, and Lower Granite—as part of the

**6.** The concept that state water quality standards should apply to the activities of the Corps of Engineers was noted in *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 182 (D.C.Cir.1982), where the court stated that statewide water quality plan may be the better regulatory tool to address "dam-caused pollution." The court also noted that new

dams cannot be built unless they comply with state water quality standards and cited to an example in South Carolina where the Corps of Engineers agreed to meet state water quality standards and include a method to remedy anticipated low dissolved oxygen problems in its construction plan for a new dam. *Id.* at 183 n. 78.

Federal Columbia River Power System. *National Wildlife Federation v. United States Army Corps of Engineers*, 92 F.Supp.2d 1072, 1074 (D.Or.2000). The plaintiffs alleged that the water quality standard violations constituted "serious, long-standing, and ongoing violations of federal law that have degraded water quality, impaired beneficial uses, and pushed imperiled salmon and steelhead species to the brink of extinction." *Id.* The Corps responded by arguing that (1) it attempted to comply with state water quality standards, (2) its decisions regarding compliance with water quality standards were reasonable, and (3) any temperature exceedences were not caused by the Corps of Engineers' operation of the dams, but rather were caused by the fact that the dams existed. 132 F.Supp.2d 876, 888–92.

The court stated it must determine whether the actions of the Corps of Engineers were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 132 F.Supp.2d 876, 878–79. "In determining whether the Corps' decision . . . regarding the operation of the dams were arbitrary and capricious, the court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 879. The court reviewed portions of the administrative record available and found that it was "not possible to conclude that the Corps complied with its legal obligations under the Clean Water Act when it made the decisions . . . based upon a review of the decisions themselves." *Id.* at 890.

The court rejected an argument by the Corps of Engineers that it was not able to comply with Washington water quality standards because of the Endangered Species Act and stated "the Endangered Species Act and the Clean Water Act 'should be read together, so that compliance with one statute does not come at the expense of the other.'" *Id.* at 891. The court ultimately found that the Corps had not complied with its legal obligations under the Clean Water Act because it had not considered all the relevant factors. *Id.* at 895. The court concluded by stating that since the claim was not an enforcement action under the Clean Water Act, the proper remedy was to remand the matter back to the agency for additional investigation and explanation. *Id.* at 895.

North Dakota's claims are similar to those asserted by the plaintiffs in *National Wildlife Federation.* North Dakota asserts that the Corps of Engineers must comply with the Clean Water Act and state water quality standards. Just as in *National Wildlife Federation,* North Dakota contends the Corps of Engineers' management decisions have resulted in alleged violations of North Dakota water quality standards. At the outset, it appears the *National Wildlife Federation* decision would support North Dakota's motion for a preliminary injunction, but a closer look reveals that North Dakota has failed to set forth a case that is likely to succeed on the merits.

■ Although this action is in the early stages of litigation, North Dakota has not attempted to show whether the Corps of Engineers sought to comply with the Clean Water Act and state water quality standards or whether the Corps of Engineers considered the effect its 2003 Annual Operating Plan would have on the Clean Water Act and state water quality standards. Instead, North Dakota has alleged *future* violations of the Clean Water Act and state water quality standards. North Dakota's failure to show either how the Corps of Engineers failed to "consider the relevant factors" when making its operational decisions for 2003 *or* how the Corps of Engineers is currently in violation of the Clean Water Act or state water quality

standards weighs against its success on the merits because North Dakota has not set forth sufficient evidence to show the Corps of Engineers acted in an arbitrary or capricious manner—the standard for such an action.

In addition, the enforcement of North Dakota's water quality standards cannot be considered in a vacuum. One significant difference between the *National Wildlife Federation* case and the current litigation is that the *National Wildlife Federation* case involved a series of dams which were all located in the same state, thus requiring the enforcement of only one set of water quality standards. In the present action, when the Corps of Engineers allegedly causes violations of North Dakota's water quality standards, and water levels are held back to protect the cold water fishery and the biological integrity of Lake Sakakawea, then other downstream states may assert similar violations of their respective water quality standards. Nebraska and South Dakota have already intervened in this action to protect their own interests, which to this point have not proven to be completely congruent with North Dakota's. Thus, the complexity of the issues present in North Dakota's claim to enforce its water quality standards appears to lessen the probability of North Dakota's success on the merits.

Finally, the Corps of Engineers asserts North Dakota has not properly promulgated the standards it has used to calculate the harm to Lake Sakakawea's cold water fishery—namely the use of a 15 degree Celsius and 5 milligrams per liter of dissolved oxygen criteria in calculating the size of the cold water fish habitat. The Corps contends that the 800,000 acre-feet long-term harm threshold and the 200,000 acre-feet irreversible harm threshold advanced by North Dakota are not based on administratively established criteria and do not constitute requirements within the

meaning of Section 313(a) of the Clean Water Act. The Corps contends that North Dakota has not adopted the specific temperature and dissolved oxygen levels it used to calculate the 800,000 and 200,000 acre-feet thresholds. As a result, the Corps argues that it had no way of knowing that its operations could potentially violate North Dakota water quality standards.

North Dakota responds by stating that Lake Sakakawea is classified as a Class 1 Lake under North Dakota Administrative Code provisions. N.D. Admin. Code § 33–16–02.1, App. II. The characteristics of a Class 1 Lake include "waters capable of supporting growth of salmonid fishes and associated aquatic biota" and "cold water fishery." N.D. Admin. Code § 33–16–02.1–09(1)(f). North Dakota correctly asserts that narrative standards are just as enforceable as numeric standards and cites to *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700, 716, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994). North Dakota also contends it is absurd for the Corps to argue that it had no knowledge that a cold water fishery thrives at water temperatures below 15 degrees Celsius with a dissolved oxygen content of 5 milligrams per liter. North Dakota submitted several Corps publications discussing precisely such parameters for a cold water fishery.

The Court acknowledges that there are some questions surrounding the sufficiency of North Dakota's published water quality standards, including whether the Corps received proper notice of what North Dakota considered the specific numeric standards necessary for "waters capable of supporting growth of salmonid fishes and associated aquatic biota." However, the Corps of Engineers' argument that it had no idea what the parameters are necessary to sustain a cold water fishery is not credible. Clearly, the Corps of Engineers knew that

a cold water fishery needs a water temperature of somewhere between 15 to 20 degrees Celsius and a dissolved oxygen content of near 5 milligrams per liter—the Corps itself has published materials referencing such standards. What is not clear is whether the Corps attempted to comply with North Dakota water quality standards or whether the Corps even considered North Dakota's water quality standards when deciding how to operate the Missouri River Mainstem Reservoir System. Again, the uncertainty surrounding such issues does not weigh in North Dakota's favor when considering its success on the merits of the underlying action.

In summary, North Dakota's probability of success on the merits appears unlikely. Although some of the jurisdictional issues raised in prior Missouri River litigation have been resolved by the recent Eighth Circuit opinion, the issue of sovereign immunity looms large in this case. To be successful on its claim that the Corps of Engineers violated the Clean Water Act, North Dakota must show that the Corps acted in an "arbitrary and capricious" manner when deciding how to operate the Missouri River Mainstem Reservoir System. Although the Corps of Engineers has been held liable for non-compliance with state water quality laws in one other reported decision, the courts have yet to see one state along a major river system comprised of several dams and reservoirs spread over many states succeed in a state water quality standards enforcement action. The Court finds that this particular *Dataphase* factor, i.e. "the likelihood of success on the merits," does not weigh in North Dakota's favor.

## B. *THE THREAT OF IRREPARABLE HARM*

■ The State of North Dakota alleges that the Corps of Engineers management of water levels in Lake Sakakawea during the next several months will violate North Dakota's water quality standards and harm the cold water fishery in Lake Sakawea. According to North Dakota, adherence to the Corps of Engineers' April 1, 2003, projected forecast and its current Annual Operating Plan will result in no cold water fish habitat remaining in Lake Sakakawea by the end of the summer of 2003.

North Dakota contends that if the volume of cold water fish habitat in Lake Sakakawea falls below 800,000 acre feet, the Corps of Engineers would violate North Dakota's water quality standards. North Dakota also argues that if the volume of the cold water fish habitat in lake Sakakawea falls below 200,000 acre feet the survival of the cold water fishery is threatened. North Dakota acknowledges that "this does not mean that a major coldwater fishery die-off will occur at 200,-000 acre-feet, but it is possible, and the possibility grows as the volume of cold water fish habitat continues to fall below this level." North Dakota suggests that by maintaining 200,000 acre-feet of cold water habitat, the irreparable harm North Dakota will suffer would be avoided. North Dakota also submits that this remedy could be achieved with adequate support for all system uses except navigation.

The Corps of Engineers responds by contending that none of the plaintiffs have made any factual showing of an actual violation of a water quality standard. Thus, the Corps argues that it is inappropriate to provide injunctive relief before a violation of any water quality standards has been established. The Corps of Engineers concludes by noting that increased precipitation or other events could lead to a situation in which North Dakota could concede that its water quality standards have not been violated.

As the Eighth Circuit Court of Appeals noted last month in *South Dakota v. Ubbe-*

*lohde,* and this Court specifically finds, all sides to this dispute seem to agree that each of the states can show that they will suffer irreparable harm absent the injunctions sought. It has become clear that protecting one state's interests from irreparable harm appears to ensure another state's interests will suffer irreparable harm. Nevertheless, North Dakota has shown it will suffer the threat of irreparable harm, and the Court finds that this *Dataphase* factor weighs in North Dakota's favor.

## C. *BALANCE OF PARTIES' INTERESTS AND PUBLIC INTEREST*

For purposes of this case where all of the parties are governmental entities, the balancing of harms between the parties and the consideration of the public interest are essentially the same and will be discussed together. North Dakota, South Dakota, Nebraska, and the Corps of Engineers have provided the Court with extensive evidence and documentation showing the varying interests each has in the Missouri River. Each is summarized below.

### 1. *NORTH DAKOTA'S INTERESTS*

Garrison Dam was completed in 1954 and is the largest dam in the mainstem system. Lake Sakakawea is the reservoir created by Garrison Dam. Garrison Dam has a storage capacity of 23.8 million acre feet (MAF), or approximately 33% of the total storage of the Missouri River Mainstem Reservoir System, 1,300 miles of shoreline, and is approximately 178 miles long. Lake Oahe, which extends into North Dakota from a dam located in South Dakota, has a storage capacity of approximately 23.1 million acre-feet of water, or approximately 31% of the total storage capacity of the Mainstem Reservoir.

North Dakota surrendered 550,000 acres of land for the construction of Garrison Dam and Lake Sakakawea. In return, North Dakota was promised hydro-electric power, most of which goes out of state, water for irrigation, which has gone largely unfunded by Congress, and the Garrison Diversion Project, which was scrapped. As one writer has noted, the "consolation prize" North Dakota received was a world class sport fishery. Brian Morris, *Unanswered Prayers: The Upper Missouri River Basin States Take on the U.S. Army Corps of Engineers,* 68 N.D. L.Rev. 897 (1992). This sport fishing industry was largely developed through the fish stocking efforts of the North Dakota Game and Fish Department. Garrison Dam National Fish Hatchery located at the base of the dam is the largest walleye and northern pike producing facility in the world.

The State of North Dakota contends that the Corps of Engineers has continually favored a dwindling downstream navigation industry over the growing upstream recreational industry, which in turn has threatened North Dakota's fishery. North Dakota officials contend that the economic benefits of downstream navigation have a value of $1–2 million as compared to a $65 million fishing and tourism industry upstream in North Dakota. (Docket No. 2, Schultz Aff., at 2–3). The economic value of Lake Sakakawea as a fishery alone is calculated to be at least $23 million a year. (Docket No. 2, Hendrickson Aff., at 2)

In 2000, 750,000 walleye were caught and 500,000 were harvested from Lake Sakakawea. Lake Sakakawea's salmon fishery generated approximately 95,600 angler hours and a catch of 17,600 salmon in 2000. (Docket No. 17, Power Aff., at 3; Docket No. 2, Lee Aff., at 2). The salmon fishery is the only source of disease free salmon in North America. North Dakota argues that if this salmon fishery is lost it would be impossible to replace. (Docket No. 2, Lee Aff., at 2). Three state parks located near the shores of Lake Sakakaw-

ea hosted 494,000 visitors in 2000. (Docket No. 2, Testimony of North Dakota Governor John Hoeven, October 23, 2002, hearing before the Corps of Engineers). A crash in the fish population is expected to result in a 73% decrease in anglers which correspond to a $17.3 million yearly economic loss until the fishery can be restored. (Docket No. 2, Schultz Aff., at 6).

### 2. *SOUTH DAKOTA'S INTERESTS*

South Dakota's interests and its position in this litigation are very similar to North Dakota's. South Dakota maintains that the Corps manages the Missouri River in a fashion that favors navigation at the expense of upstream fisheries. South Dakota attacks the barge industry by alleging that it operates at only 12.5% of 1939 predictions. South Dakota also points out, as did North Dakota, that the barge industry is responsible for only $1–2 million in yearly economic production. (Docket No. 40, Exhibit L, Testimony of Dr. C. Phillip Baumel).

South Dakota's reservoirs are also nationally recognized walleye fisheries. Recreational fishing on these lakes and the Missouri River in South Dakota generate up to $51 million in revenue each year. (Docket No. 26, Cooper Aff., at 4). The favoring of navigation has severely impacted Lake Oahe. Lake Oahe generates $20 million a year in revenues when lake levels are normal. (Docket No. 26, Cooper Aff., at 3). In 2000, Lake Oahe generated only $8.2 million in revenues. (Docket No. 26, Cooper Aff., at 7). The Corps drew down Lakes Oahe in 2002 and as a result 50% of the smelt eggs were lost. With few forage fish available the walleye population in Lake Oahe has declined and average catch weights have dropped markedly. (Docket No. 27, Nelson–Stastny Aff., at 12). Lakes Sharpe, Francis Case, and Lewis and Clark are threatened with a similar fate if the Corps continues its current manage-

ment policies and the drought persists. (Docket No. 27, Nelson–Stastny Aff., at 14).

### 3. *NEBRASKA'S INTERESTS*

The State of Nebraska has also asserted it has a number of industries that will be seriously impacted by reduced water flows in the Missouri River this summer. These industries are estimated to provide over $424 million annual economic benefit to Nebraska. (Docket Nos. 45 and 46 Appendices, Wade Aff., at 340–43). In their pleadings on file in this dispute, Nebraska contends it has power plants that rely on the Missouri River to operate within federal standards, and unless water is available at certain minimum levels, four nuclear power plants may not be able to operate. (Docket No. 11, Patterson, Aff., at 4–5). Nebraska also argues there will be significant harm to the water supplies of municipalities and a resulting increase in treatment costs with reduced flows. Nebraska has a vibrant fishing and recreational industry which will be impacted by reduced flows this summer. (Docket No. 11, Patterson Aff., at 6). Nebraska contends there will be reduced economic activity associated with low flow conditions that may result in lost tax revenues in excess of millions of dollars. Nebraska has its own regulatory schemes for water quality and anti-pollution laws and regulations and with diminished water flows, there will be an increase in water temperature which will alter the chemical and biological characteristics of the water with resulting violations of Nebraska's laws and regulatory schemes. (Docket No. 9, Esseks Aff., at 2–3). The City of Omaha relies on the Missouri River for water and recreation, as do other large cities in bordering Iowa and Missouri. Finally, Nebraska states there are 71 recreational areas located between Sioux City, Iowa, and the mouth of the Missouri River that will be significant-

ly impacted by reduced flows this summer. (Docket No. 11, Patterson Aff., at 6).

#### 4. *CORPS OF ENGINEERS' INTEREST*

The Corps of Engineers argues its interests are similar to the public interest. The Corps asserts that the public interest is best met if the Missouri River Mainstem Reservoir System is operated in accordance with a considered and carefully developed plan. The Corps dismisses the interests of each states as "parochial."

■ Just as the irreparable harm analysis revealed, each state has significant economic, environmental, and recreational interests in the Missouri River. For each compelling argument advanced by a particular state, there is an equally compelling argument presented by another state. As the Court has stated before, this matter cannot simply be resolved by tallying the alleged economic impact and favoring the state with the largest investment. Because of the complexity of each state's interests, no state's interests clearly outweigh the others. The Court finds the *Dataphase* factors of balancing the parties interests and consideration of the public interest do not weigh in favor of any particular party to this litigation.

### IV. *CONCLUSION*

■ This Court is very cognizant of the importance of Lake Sakakawea to the State of North Dakota, and particularly the importance to the fishing, recreation, and tourism industries. Garrison Dam, Lake Sakakawea, and the Missouri River are of vital importance to the State of North Dakota. Unfortunately, Mother Nature has not been kind and we are now experiencing the fourth year of a significant drought in the Missouri River Basin. Hopefully, the last month of rain, combined with increased snow melt from the mountains in Montana, signals an end to the drought. The sharply divergent interests of the many states that are affected by the Corps of Engineers' plans for operation of the Missouri River Mainstem Reservoir System have again resulted in a multitude of lawsuits filed in federal courts throughout the region.

The operation of the Missouri River Mainstem Reservoir System is a complex task. The Corps of Engineers is charged with the responsibility of managing the river and its attendant reservoirs. The Corps must attempt to strike a balance among many interests, including flood control, navigation, and recreation. As the Eighth Circuit recently noted, during the good times the Corps of Engineers can accommodate all such interests, but in drought conditions, the Corps is forced to make difficult choices. Those hard choices have led to, and will continue to lead to, litigation seeking injunctions by the states which border the Missouri River from Montana to Missouri.

The operation of the Missouri River is significantly effected by natural forces as well as by the Corps of Engineers in the manipulations of the available water. The recent pronouncement from the Eighth Circuit makes it expressly clear that the Corps is required to follow the Master Manual and its Annual Operating Plan. The Corps is not free to ignore the Master Manual and federal courts can review the Corps of Engineers' actions to ensure conformity with the Master Manual. Thus, the Eighth Circuit has established a standard for the activities and operations of the Corps of Engineers in operating the Missouri River Mainstem Reservoir System that this Court is obligated to follow.

The June 4, 2003, decision of the Eighth Circuit in *South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir.2003) seems to refute the notion that North Dakota's water quality standards should control the man-

agement and operations on the Missouri River. The Eighth Circuit has granted considerable discretion to the Corps and this Court is reluctant to interfere with the exercise of that discretion at this stage of the litigation. The Eighth Circuit's position of giving deference to the Corps' actions is revealed in the following language from the decision issued on June 4, 2003:

> Courts are simply not empowered to review every decision of the Corps to ensure that it maximizes the benefits of the River for all interests. Indeed, such a standard would be impossible to meet, anyway. In times of drought it is not possible for both navigation and fishery benefits to be maximized. Something has to give.

*South Dakota v. Ubbelohde,* 330 F.3d 1014, 1031.

The testimony presented at the hearing on June 4, 2003, revealed that the latest forecasts project that the levels on Lake Sakakawea are expected to remain fairly constant throughout the summer due to increased precipitation and favorable conditions for runoff. In the event that such conditions change and the Corps of Engineers alters its operational plans for 2003, this Court may be forced to intervene. In the event that other court orders entered in other federal or state jurisdictions strip the Corps of Engineers of its ability to objectively function as a steward of the Missouri River water flows, and the interests of upstream water users are placed in harms way, this Court will be forced to intervene. However, after carefully considering the equitable factors that this Court is required to consider in ruling on North Dakota's Motion for Preliminary Injunction, the Court does not believe that a preliminary injunction is warranted at this stage of the litigation. The granting of a preliminary injunction is an extraordinary remedy and the right to such relief must be clearly established by the movant. It

has not been clearly established in this case.

Although the irreparable harm factor weighs in North Dakota's favor, and the balance-of-harms and public interest criteria present close questions, the dispositive factor is the likelihood of success of the merits. This issue weighs against North Dakota based on the likelihood that the Corps of Engineers will be able to successfully argue it is immune from suit under Section 511 [33 U.S.C. § 1371] of the Clean Water Act. This factor also weighs against North Dakota as a result of the June 4, 2003, decision of the Eighth Circuit Court of Appeals in *South Dakota v. Ubbelohde,* 330 F.3d 1014 (8th Cir.2003). North Dakota is not entitled to a preliminary injunction at this state of the litigation.

The State of North Dakota's Motion for a Preliminary Injunction is **DENIED.** (Docket No. 2).

**IT IS SO ORDERED.**